Valeria JACKSON, Tella Robinson, Lee Robinson, Valerie Jackson, Santana Jackson, Tommie Jackson, by Valeria Jackson, Special Administrator of their estates, and on their own behalf, Ann Paterson, Annette Paterson, Roy Hunt, and James W. Phelan, Plaintiffs-Appellants,

v.

Jane BYRNE, individually and as Mayor of the City of Chicago, Richard Brzeczek, individually and as Superintendent of the Chicago Police Department, Administrator of the estate of Richard Albrecht, individually and as Superintendent of the Chicago Fire Department, Frank Muscare, individually and as Lieutenant of the Chicago Fire Department and President of Local Firefighters Union # 2, John Does, whose names are not presently known to Plaintiffs who were employees of the City of Chicago, individually and in their official capacities at the time alleged in the complaint, the City of Chicago, a municipal corporation, Chicago Firefighters Local Union # 2, a labor union, Defendants-Appellees.

No. 83-1795.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 4, 1984.

Decided July 20, 1984.

Rehearing Denied Aug. 20, 1984.

Joachim J. Brown, Chicago, Ill., for plaintiffs-appellants.

Lynn K. Mitchell, Asst. Corp. Counsel, Gilbert A. Cornfield, Cornfield & Feldman, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, and PELL and CUDAHY, Circuit Judges.

PELL, Circuit Judge.

Two children were asphyxiated during a fire in their residence. The fire broke out in the winter of 1980, at the time of a strike by municipal fire fighters in the City of Chicago. This civil rights case arises from the deaths of those children and from the destruction of property caused by the fire. Plaintiffs-appellants appeal from the district court's entering summary judgment against them. At issue on appeal is wheth-er defendants-appellees deprived plaintiffs and plaintiffs' decedents of rights secured by the Due Process Clause of the Fourteenth Amendment to the federal Constitution.

## I. FACTS

The submissions of the parties to the district court reveal the following undisputed facts. In late 1979, Chicago municipal fire fighters, represented by Chicago Firefighters Local Union Number Two, entered negotiations with the City of Chicago for a collective bargaining contract. On December 16, the fire fighters authorized a strike in support of their bargaining demands, but they did not carry out their threatened work stoppage until February 14, 1980. On February 14, the city successfully moved in state court for a temporary restraining order, which enjoined Local Union Number Two from engaging in any strike activity against the City of Chicago. On the same day, the Superintendent of the Chicago Fire Department ordered all members of the Chicago Fire Department to report for regular duty, advising that members who failed to report would be subject to discipline, including dismissal. Jane Byrne, at that time Mayor of the City of Chicago, also demanded that the fire fighters return to work and caused the following notice to be printed in the February 14 issue of the Chicago Tribune newspaper: "Anyone who does not report for work ... will never again work for the Chicago Fire Department. Never! If they walk off this job, they can forget they were ever members of the Chicago Fire Department."

Despite the temporary restraining order, the order of the Fire Commissioner, and the threats of the city's mayor, approximately 3500 of the city's 4000 fire fighters honored the strike. The union proposed to the city a "Realistic Strike Plan," under which the city was to turn over fire-fighting equipment to the union and permit the union unilaterally to provide fire-fighting services. The city rejected the union's plan and instead implemented its own "Task Force Plan." Under the Task Force Plan,

non-striking fire fighters were to report to the Chicago Fire Academy, from which they were assigned to designated operating firehouses. All other city firehouses were to be closed and guarded by Chicago policemen. The city advanced several reasons for closing all but a few designated firehouses. First, the available manpower would be more effective if it were concentrated in a few locations rather than being thinly dispersed throughout the city. Second, several firehouses had suffered damage due to sabotage. Third, the police could more easily protect the non-striking fire fighters if they were concentrated in a small number of locations. The striking fire fighters chose to picket in front of firehouses throughout the city. Mayor Byrne and Richard Brzeczek, at that time Superintendent of the Chicago Police Department, ordered city policemen to bar striking fire fighters from entering any municipal firehouse.

The City of Chicago and Local Union Number Two appeared to reach a settlement on February 20, 1980, but the accord dissolved on February 21, and the strike continued until March 8, 1980, when representatives of the city and the union.signed a strike settlement agreement and a collective bargaining agreement. The city subsequently reinstated the striking fire fighters.

At approximately 3:30 p.m. on February 22, 1980, while the strike was still in effect, a fire broke out at three residential buildings, 646, 648, and 652 North Ridgeway in Chicago. A city firehouse that was not manned by assigned fire fighters was located across the street from the residential buildings. Four striking fire fighters picketed in front of that firehouse as the Chicago police stood guard. The four picketing fire fighters detected the fire and tried to gain access to the guarded firehouse, but the police barred their way. The fire fighters did assist residents to safety from the first floor of the building at 646 North Ridgeway and tried to reach the second floor of that building but were driven back by smoke and heat. Fire Department records show that at 3:35 p.m. a fire call

was placed from the firehouse and at 3:43 p.m., thirteen minutes after the fire was detected, a fire truck dispatched from one of the manned firehouses arrived at the scene of the fire. The four striking fire fighters assisted the dispatched crew in extinguishing the blaze, but despite the efforts of the fire fighters the children Santana Jackson and Tommie Jackson lost their lives.

Plaintiffs in this case are the parents of the deceased children. In addition, residents and landlords of the residential buildings, seeking redress for their loss of property, have joined as plaintiffs. Defendants are, among others, the former mayor of Chicago Jane Byrne, the former police superintendent Richard Brzeczek, the president of the fire fighters union local Frank Muscare, the City of Chicago, and unnamed police officers. Plaintiffs alleged a federal cause of action under 42 U.S.C. § 1983, claiming that defendants deprived plaintiffs of rights guaranteed under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution. Plaintiffs also asserted pendent wrongful death and. civil rights claims under the laws of Illinois. The district court dismissed the federal cause of action on summary judgment and then exercised its discretion not to hear the remaining state law claims. This appeal is taken from the district court's dismissal of the suit.

## II. DISCUSSION

■ This court has repeatedly stated that plaintiffs who have suffered tortious injury are not entitled to Section 1983 relief merely because the defendant is a government official. *See, e.g., Jackson v. City of Joliet,* 715 F.2d 1200, 1203 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982). Section 1983 imposes liability only for violations of rights secured by the Constitution or federal law. *See Baker v. McCollan,* 443 U.S. 137, 146–47, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979). Accordingly, the start-

ing point in an analysis of a Section 1983 claim is the isolation of the specific federal right that plaintiff claims defendant violated when acting under color of state law. Here plaintiffs allege violations of rights secured under the Fifth and Eighth Amendments and under the Due Process Clause of the Fourteenth Amendment, but as the district court correctly determined, the former two Amendments are not implicated by the facts of this case. Plaintiffs have alleged no action by the federal government, as the Fifth Amendment requires, and the Eighth Amendment is not implicated because no governmental unit imposed penalties on plaintiffs. Accordingly, only the Due Process Clause of the Fourteenth Amendment could give rise to a successful Section 1983 claim in this case.

▇ Appellants claim that the facts in this case implicate the Fourteenth Amendment's protection against deprivation of life or property without due process, but that position is untenable. Although there were deaths in this case, the state did not, within the meaning of the Fourteenth Amendment, "deprive" plaintiffs' decedents of life. The fire killed Santana and Tommie Jackson, government officials did not. Our analysis would no doubt be different if government officials set the fire or placed forces in motion which ignited the fire that claimed the lives of the Jackson children. *Cf. Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980). Government involvement in the setting of the fire, however, has never been part of plaintiffs' theory of the case. A similar analysis demonstrates that the Fourteenth Amendment's protection against deprivation of property without due process is not implicated in this case.

▇ Appellants respond with a second theory under which the city deprived Santana and Tommie Jackson of life. They contend that even if government officials did not put a match to the North Ridgeway residences, the city did fail adequately to protect plaintiffs' decedents from a fire of independent origins. Hence the district court, appellants maintain, incorrectly rendered summary judgment because a trial could have established a causal connection between the omission and the deaths. Appellants' argument fails to persuade us. Not every death that results from the state's failure to act is a "depriv[ation]" under the Fourteenth Amendment. Before an omission that leads to a death is actionable under the Fourteenth Amendment and Section 1983, the Constitution must recognize an underlying duty on the part of the state to act.

▇ We have elsewhere stated that nothing in the Constitution requires governmental units to act when members of the general public are imperiled, *see Beard v. O'Neal*, 728 F.2d 894 (7th Cir.1984); *Jackson, supra,* and we need only briefly summarize our position here. In our opinion, "the Constitution is a charter of negative liberties; it tells the [government] to let people alone; it does not require the federal government or the state to provide services, even so elementary a service, as maintaining law and order." *O'Neal, supra,* at 899, *quoting Bowers, supra,* at 618. Thus, when the Chicago fire fighters carried out their strike threat and left the city with a fraction of its former protective work force, they did not omit to perform a duty required of them by the Constitution. The Constitution creates no positive entitlement to fire protection. Similarly, when Mayor Byrne dismissed the striking fire fighters, she did not cause the city to default on an obligation recognized by the Constitution. The fire fighters may have violated state law forbidding work stoppages by essential civil servants and could very well be liable to plaintiffs under principles of state tort law. Nonetheless, the fire fighters, standing under no constitutional duty to act, did not effect a deprivation within the meaning of the Fourteenth Amendment.

We recognize that in certain cases courts have found that the Constitution creates an affirmative duty on the part of governmental units to provide elementary protective services to specified individuals. In every one of those cases, however, the individuals

entitled under the Constitution to governmental services were persons with whom the state had created a custodial or other special relationship. Thus, in *Estelle v. Gamble,* 429 U.S. 97, 104–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976), the Supreme Court recognized a constitutional duty on the part of the state not to be deliberately indifferent to the medical needs of its prison inmates. Similarly, in *White v. Rochford,* 592 F.2d 381 (7th Cir.1979), we recognized that the Constitution creates a duty on the part of police officers to protect minor children from immediate hazards after police officers arrest the children's guardian. *See also Johnson v. Zerbst,* 304 U.S. 458, 463, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938) (certain indigent defendants constitutionally entitled to appointed counsel); *Spence v. Staras,* 507 F.2d 554 (7th Cir.1974) (state mental hospital constitutionally required to protect inmate from known risk of assault); *Byrd v. Brishke,* 466 F.2d 6 (7th Cir.1972) (police officers constitutionally required to render aid to victim who is being beaten by officers' colleagues). In the case at bar, the state bore no special relationship to plaintiffs or plaintiffs' decedents and hence had no obligation under the Constitution to provide them with protective services. *See Fox v. Custis,* 712 F.2d 84, 88 (4th Cir.1983).

We are not unmindful of the argument that the city acquired a constitutional duty to provide services once it established itself as the provider of fire protection and thereby lessened the incentive for private citizens to protect themselves. The same theory, however, would lead to liability when a state takes on the task of removing the criminally insane from society and then releases a lunatic who has not been cured of his propensity for violence, *see Bowers, supra,* or when a municipality sets speed limits for train traffic at railroad crossings and then refuses to enforce its own train speed ordinance, *see Hull v. City of Duncanville,* 678 F.2d 582 (5th Cir.1982). In neither case did the governmental unit deprive a victim of life by omitting to perform a constitutionally cognizable duty. We decline today to break with the *Bowers* and *Hull* line of reasoning. To do so would open the way for scrutiny by the federal courts of virtually every municipal decision to reallocate protective resources. Neither the Fourteenth Amendment nor Section 1983 was meant to give the federal courts such a role. *See Jackson, supra,* at 1204.

The case would be a different one if the selection of firehouses to close during the pendency of the strike had been done on a discriminatory basis. Even a random closing of firehouses, the pattern which the city apparently followed, would have to conform to the dictates of minimum rationality. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 441–42, 102 S.Ct. 1148, 1160–61, 71 L.Ed.2d 265 (1982) (separate opinion of Blackmun, J.). Appellants, however, have never contended that the city denied them equal protection of the laws.[1]

If plaintiffs only alleged that the Chicago fire fighters went on strike and that Mayor Byrne dismissed the strikers, then our analysis would end there. Government officials did not directly kill the Jackson children, and the Constitution does not guarantee to members of the public at large the adequacy of elementary protective services. Appellants, however, advance a third and final theory under which the city deprived plaintiffs' decedents of life. The submissions of the parties reveal that Chicago police officers prevented picketing fire fighters from gaining access to a municipal firehouse. Appellants contend that if we take our own words seriously—namely that the Constitution secures the right to keep the government away—we are compelled to reverse the grant of summary judgment. A trial could have established that the Chicago police officers who obstructed others from effecting a rescue contributed to the deaths of the Jackson children and thereby violated the constitutional guarantee against deprivation of life.

---

1. "Due process" also imposes on the state a requirement that it act rationally. Since, however, there was no deprivation in this case, we need not consider whether the state accorded plaintiffs and plaintiffs' decedents "due process."

██ We agree that the state can deprive a person of life either by directly inflicting harm on him or by preventing others from rescuing him. For example, if the police were arbitrarily to prevent a doctor from saving the life of an accident victim, the state could be said to "deprive" the victim of life within the meaning of the Fourteenth Amendment. The flaw in the application of this theory to the case at bar, however, is that the police merely excluded picketing fire fighters from a firehouse and did not otherwise obstruct the efforts of those who tried to rescue Santana and Tommie Jackson. Had the police physically blocked the path of the picketing fire fighters as they endeavored to reach the apartment of plaintiffs' decedents, plaintiffs would have a colorable argument that the police effected a deprivation under the Fourteenth Amendment. It is undisputed, however, that the police freely permitted the fire fighters to approach the burning building and aid in the rescue of the occupants. The police only barred the fire fighters from reaching city fire equipment, and our examination of that action by the police collapses into our analysis of the duty to provide adequate fire protection. The Constitution does not require a municipality to provide potential rescuers with even the most elementary fire-fighting equipment. The fact that the city had fire-fighting equipment nearby and still refused rescuers access to it does not change our analysis. Nothing in the Constitution requires governmental units to allow potential rescuers access to equipment it has already acquired. The Constitution only requires that if the city denies its Good Samaritans access to its equipment, it do so in a non-discriminatory fashion. Plaintiffs, however, have never suggested that this case implicates the equal protection guarantees of the Fourteenth Amendment.

## CONCLUSION

The submissions of the parties show that the district court correctly preempted a trial in this case. Plaintiffs were not prepared to offer evidence at trial showing that defendants effected a "depriv[ation]" with-

in the meaning of the Fourteenth Amendment. The evidentiary matter before the district court revealed no government involvement in the setting of the fire that claimed the lives of the Jackson children and caused plaintiffs to suffer property damage. Although the submissions of the parties did show an omission to act on the part of some defendants, that omission is not actionable because the Constitution recognizes no affirmative duty on the part of governmental units to provide adequate fire protection to members of the public at large. Plaintiffs were prepared to show at trial that municipal police officers barred picketing fire fighters from gaining access to city fire equipment, but our examination of that action on the part of the police is identical with our analysis of the defendants' omission to act. The district court accordingly was correct to render summary judgment in favor of defendants on the federal cause of action. The court then properly exercised its discretion to dismiss the pendent state law claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Financial Bankshares v. Metzger*, 680 F.2d 768, 772 (D.C.Cir.1982). For these reasons the judgment of the district court is

AFFIRMED.