826 F.2d 1030
 56 USLW 2151
 Toni E. WIDEMAN and Myron Wideman, Individually and as
Parents of Decedent Ebony Laslun Wideman, and Toni E.
Wideman, in her capacity as Administratrix of the Estate of
Ebony Laslun Wideman, Plaintiffs-Appellants,
v.
SHALLOWFORD COMMUNITY HOSPITAL, INC., A Georgia Corporation,
et al., Defendants-Appellees.
 No. 86-8512.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 8, 1987.
 
 Wade K. Copeland, Atlanta, Ga., for plaintiffs-appellants.
 Albert Sidney Johnson, DeKalb Co. Atty., Decatur, Ga., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before HILL, KRAVITCH and EDMONDSON, Circuit Judges.
 HILL, Circuit Judge:
 
 
 1
 This case presents the novel question of whether a county government's alleged practice of using its emergency medical vehicles only to transport patients to certain county hospitals which guarantee the payment of the county's medical bills violates a right protected by the federal constitution. We hold that such a practice, even if proved, would not violate any established constitutional right; therefore, the plaintiffs have failed to state a claim under 42 U.S.C. Sec. 1983.
 
 I. BACKGROUND
 
 2
 The facts underlying this case are undeniably tragic. On April 12, 1984, Toni Wideman, who at the time was four months pregnant, began experiencing abdominal pain. She called her obstetrician, Dr. John Ramsey, who instructed her to come immediately to Piedmont Hospital. Ms. Wideman called the 911 emergency telephone number in DeKalb County and requested an ambulance to take her to Piedmont. Three employees of the DeKalb County Emergency Medical Service (EMS) responded to this call. Ms. Wideman claims that she again informed the EMS employees to take her to Piedmont where her doctor was waiting, but they refused and, instead, took her against her wishes to Shallowford Community Hospital. After a substantial delay, during which the attending physician at Shallowford spoke by phone with Dr. Ramsey, Ms. Wideman was transferred to Piedmont. At that point, however, Dr. Ramsey was unable to stop her labor, and Ms. Wideman gave birth to a premature baby, named Ebony Laslun Wideman, who survived for only four hours.
 
 
 3
 Toni Wideman and her husband subsequently filed this action under 42 U.S.C. Secs. 1983, 1985 and 1988 seeking damages for the wrongful death of their child. Specifically, they alleged that a conspiracy existed between Shallowford Hospital and DeKalb County, whereby the County had a policy and practice of using its emergency medical vehicles to transport patients only to hospitals such as Shallowford which guaranteed the payment of the County's emergency medical bills. Piedmont Hospital supposedly had no such agreement with DeKalb County. The plaintiffs claimed that this conspiracy deprived them of their federal constitutional right to essential medical treatment and care. In addition, the plaintiffs alleged various pendent state law claims based on false imprisonment, negligence, and intentional infliction of emotional distress. The Widemans named as defendants DeKalb County, Shallowford Hospital, and the three DeKalb County EMS employees in their official capacities.
 
 
 4
 The plaintiffs sought discovery against the County and the EMS employees. The plaintiff served interrogatories and noticed the depositions of the three EMS employees, as well as a designated individual for the County. The County and its employees, however, refused to participate in discovery due to the unresolved nature of a potential immunity defense. Shortly thereafter, the governmental defendants moved for summary judgment. They supported this motion with the affidavits of the three EMS employees, but still refused to make these individuals available to the plaintiffs. Defendant Shallowford Hospital also moved for partial summary judgment on the plaintiffs' federal claims. The plaintiffs then moved for leave to amend their complaint, supported by the affidavit of Kenneth Lamoureux, a former employee of the DeKalb County EMS.[1] The plaintiffs also filed a motion to compel discovery and a motion for a continuance pursuant to Fed.R.Civ.P. 56(f).
 
 
 5
 The district court denied all of the plaintiffs' motions. Further, finding the plaintiffs' opposing affidavits to be "wholly inadequate" to establish the alleged policy and conspiracy, the court granted summary judgment in favor of all defendants on the plaintiffs' federal claims.[2] This appeal followed.
 
 II. NATURE OF A SECTION 1983 ACTION
 
 6
 The Widemans' federal claims are brought pursuant to the federal civil rights statutes, primarily 42 U.S.C. Sec. 1983. It is well established that section 1983 itself creates no substantive rights; it merely provides a remedy for deprivations of federal rights established elsewhere. City of Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985) (plurality); Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 1948, 85 L.Ed.2d 254 (1985); Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed. 433 (1979). To sustain a cause of action based on section 1983, the Widemans must establish two elements: (1) that they suffered a deprivation of "rights, privileges or immunities secured by the Constitution and laws" of the United States, and (2) that the act or omission causing the deprivation was committed by a person acting under color of law. Dollar v. Haralson County, 704 F.2d 1540, 1542-43 (11th Cir.), cert. denied, 464 U.S. 963, 104 S.Ct. 399, 78 L.Ed.2d 341 (1983). Thus, section 1983 imposes liability only "for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." Baker v. McCollan, 443 U.S. at 146, 99 S.Ct. at 2695. It does not provide a remedy for "any and all injuries inflicted by persons acting under color of state law." Washington v. District of Columbia, 802 F.2d 1478, 1480 (D.C.Cir.1986). Absent the existence of an underlying constitutional right, no section 1983 claim will lie.
 
 
 7
 When a local governmental entity is the subject of a section 1983 suit, the plaintiff bears an additional burden. To establish the liability of a city or county under section 1983, the plaintiff must show that the constitutional deprivation resulted from a custom, policy, or practice of the municipality. Monell v. Dept. of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); Bradberry v. Pinellas County, 789 F.2d 1513, 1515 (11th Cir.1986). Moreover, proof of a single, isolated incident of unconstitutional activity generally is not sufficient to impose municipal liability under Monell. City of Oklahoma City, 471 U.S. at 823-24, 105 S.Ct. at 2436; Anderson v. City of Atlanta, 778 F.2d 678, 685 (11th Cir.1985).
 
 
 8
 The arguments and briefs both in this court and in the district court have focused primarily on the dispute as to whether the plaintiffs have made a sufficient showing that the alleged custom or practice in fact exists. The plaintiffs' arguments on appeal regarding discovery, the amendment of their complaint, and the sufficiency of their affidavits all relate to the issue of the existence of the allegedly unlawful policy. Similarly, the defendants' arguments relate to whether the plaintiffs' evidence is sufficient to establish such a policy, and, if so, whether the individual defendants can avail themselves of a qualified immunity defense. It seems that both parties, as well as the district court, have assumed that the alleged policy violates a cognizable constitutional right, which the plaintiffs characterize as their right to the provision of essential medical treatment and services by the County.[3] However, because section 1983 provides a remedy only for violations of rights secured by the Constitution or federal laws, the proper resolution of this case requires us first to determine whether the Constitution grants a right to medical care and treatment in these circumstances.
 
 
 9
 III. EXISTENCE OF A CONSTITUTIONAL RIGHT TO ESSENTIAL MEDICAL CARE
 
 A.
 
 10
 Beginning from the broadest prospective, we can discern no general right, based upon either the Constitution or federal statutes, to the provision of medical treatment and services by a state or municipality. If such a right exists at all, it must derive from the fourteenth amendment's due process clause, which forbids a state to deprive anyone of life, liberty or property without due process of law. The due process clause, however, has traditionally been interpreted as protecting certain "negative liberties," i.e., an individual's right to be free from arbitrary or discriminatory action taken by a state or municipality. This circuit has recognized the "well established notion that the Constitution limits the actions the states can take rather than mandating specific obligations." Bradberry v. Pinellas County, 789 F.2d 1513, 1517 (11th Cir.1986). The Constitution is "a charter of negative rather than positive liberties." Jackson v. City of Joliet, 715 F.2d 1200, 1203 (7th Cir.1983), cert. denied, 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984). "[I]t tells the state to let people alone; it does not require the federal government or the state to provide services...." Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982).[4]
 
 
 11
 Two Supreme Court decisions dealing with access to abortions also support our conclusion that there is no general right to medical care or treatment provided by the state. In Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), two indigent women brought suit challenging a Connecticut regulation prohibiting the funding of abortions that were not medically necessary. The plaintiffs argued under the fourteenth amendment that the state regulation impinged on their constitutional right to an abortion, as recognized in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The Court upheld the state regulation, concluding that Roe did not declare an unqualified constitutional right to an abortion; rather, that case declared a woman's right to be protected from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy. Significantly, in reaching this result, the Court noted that "[t]he Constitution imposes no obligation on the States to pay the pregnancy-related medical expenses of indigent women, or indeed to pay any of the medical expenses of indigents." Maher, 432 U.S. at 469, 97 S.Ct. at 2380 (footnote omitted).
 
 
 12
 The Court's subsequent decision in Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) reinforced the constitutional distinction between requiring the state to provide medical services and prohibiting the state from impeding access to such services. The plaintiffs in Harris challenged the constitutionality of the Hyde amendment, which denied public funding for certain medically necessary abortions, as violating their due process liberty interest in deciding whether to terminate a pregnancy. The Supreme Court held that although the liberty protected by the due process clause prohibits unwarranted government interference with freedom of choice in the context of certain personal decisions, "it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." Harris, 448 U.S. at 317-18, 100 S.Ct. at 2688. The court concluded that the limitation on governmental power implicit in the due process clause does not translate into an affirmative obligation on the part of government to fund abortions or other medically necessary services. Id. at 318, 100 S.Ct. at 2688. More recently, the Court has interpreted Maher and Harris as standing for the proposition that, "[a]s a general matter, the State is under no constitutional duty to provide substantive services for those within its border." Youngberg v. Romeo, 457 U.S. 307, 317, 102 S.Ct. 2452, 2459, 73 L.Ed.2d 28 (1982).
 
 
 13
 Several court of appeals decisions have addressed the issue of whether a state or municipality has a duty under the fourteenth amendment to provide various protective services to its citizens. Almost without exception, these courts have concluded that governments are under no constitutional duty to provide police, fire, or other public safety services. In Estate of Gilmore v. Buckley, 787 F.2d 714 (1st Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986), the plaintiff attempted to hold various state and county officials liable for the murder of his decedent by an inmate on furlough from a local prison. Concluding that the plaintiff failed to state a claim under section 1983, the court began from the premise that "[n]othing in the fourteenth amendment or its history ... suggests that it was written to provide an expansive guarantee of state protective services." Id. at 720. At issue in Jackson v. Byrne, 738 F.2d 1443 (7th Cir.1984) was the City of Chicago's alleged duty to provide fire protection for its residents. The Jackson court flatly held that the Constitution "creates no positive entitlement to fire protection." 738 F.2d at 1446. Painting with a broader brush, that court stated that "the Constitution does not guarantee to members of the public at large the adequacy of elementary protective services." Id. at 1447. See also Jackson v. City of Joliet, 715 F.2d at 1204 ("[A]s currently understood, the concept of liberty in the Fourteenth Amendment does not include a right to basic services, whether competently provided or otherwise.").
 
 B.
 
 14
 That there exists no such general right to the provision of medical care and services by the state, however, does not end our inquiry. Both the Supreme Court and various circuit courts have indicated that the existence of a "special custodial or other relationship" between an individual and the state may trigger a constitutional duty on the part of the state to provide certain medical or other services. In these special circumstances, the state's failure to provide such services might implicate constitutionally protected rights.
 
 
 15
 For example, the Supreme Court has held that the eighth amendment prohibition against cruel and unusual punishments, applicable to the states via the fourteenth amendment, requires states to provide medical care for those whom it is punishing by incarceration. Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). The Court concluded that "deliberate indifference" to the serious medical needs of prisoners violates the eighth amendment and therefore states a cause of action under section 1983.[5] Similarly, the Court has held that an involuntarily committed mental patient retains certain constitutionally protected substantive liberty interests under the fourteenth amendment. Youngberg v. Romeo, 457 U.S. 307, 315-19, 102 S.Ct. 2452, 2457-59, 73 L.Ed.2d 28 (1982). The state defendants in that case conceded, and the Court accepted, the fact that mental patients have a clear fourteenth amendment right "to adequate food, shelter, clothing, and medical care." Youngberg, 457 U.S. 315, 102 S.Ct. at 2457.
 
 
 16
 Courts have also recognized the existence of a special relationship imposing a duty on a state or municipality to provide care and treatment for persons in its custody in situations less extreme than permanent incarceration or institutionalization. In Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986), this court concluded that the due process clause of the fourteenth amendment mandates that pretrial detainees must be provided with at least minimally adequate levels of food, living space, and medical care, just as the eighth amendment requires such standards for convicted prisoners. Id. at 1573. Further, in City of Revere v. Massachusetts General Hosp., 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983), the Supreme Court held that the due process clause requires "the responsible government or governmental agency to provide medical care to persons ... who have been injured while being apprehended by the police." Id. at 244, 103 S.Ct. at 2983. See also Maddox v. City of Los Angeles, 792 F.2d 1408, 1415 (9th Cir.1986) ("The due process clause requires responsible governments and their agents to secure medical care for persons who have been injured while in police custody."). Although the Supreme Court in City of Revere declined to define the exact nature of the state's obligation in such circumstances, it held that "[w]hatever the standard may be, [the city] fulfilled its constitutional obligation by seeing that [the suspect] was taken promptly to a hospital that provided the treatment necessary for his injury." 463 U.S. at 245, 103 S.Ct. at 2983.[6]
 
 
 17
 Admittedly, "[t]he contours of what constitutes a 'special relationship' between a municipality, acting through its officials, and its citizens are hazy and indistinct." Ellsworth v. City of Racine, 774 F.2d 182, 185 (7th Cir.1985), cert. denied, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). It is possible, however, to discern certain general guidelines regarding the existence of such a right-duty relationship. The primary thread weaving these special relationship cases together is the notion that
 
 
 18
 if the state takes a person into custody or otherwise assumes responsibility for that person's welfare, a "special relationship" may be created in respect of that person, and the fourteenth amendment imposes a concomitant duty on the state to assume some measure of responsibility for the person's safety and well-being.
 
 
 19
 Estate of Gilmore, 787 F.2d at 721. In the prison context, for example, an inmate becomes dependent on the state to provide certain basic human needs, such as food, shelter, and medical care, which by virtue of his incarceration he can no longer provide for himself. See Fitzke v. Shappell, 468 F.2d 1072, 1076 (6th Cir.1972). Stated more broadly, the rationale for imposing these special relationships "lies in constraints the state imposes on private action." Walker v. Rowe, 791 F.2d 507, 511 (7th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986).[7]
 
 
 20
 Following this rationale, a constitutional duty can arise only when a state or municipality, by exercising a significant degree of custody or control over an individual, places that person in a worse situation than he would have been had the government not acted at all. Such a situation could arise by virtue of the state affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid. See Walker, 791 F.2d at 511; Estate of Gilmore, 787 F.2d at 722. The key concept is the exercise of coercion, dominion, or restraint by the state. The state must somehow significantly limit an individual's freedom or impair his ability to act on his own before it will be constitutionally required to care and provide for that person.
 
 
 21
 In the present case, we conclude that DeKalb County did not exercise a degree of coercion, dominion, or restraint over Ms. Wideman sufficient to create a "special relationship," thus imposing on the County a constitutional duty to provide her with the medical treatment she alleges was necessary. The County did not force or otherwise coerce her into its ambulance;[8] it merely made the ambulance available to her, and she entered it voluntarily. Ms. Wideman's physical condition at the time might have required her to seek immediate medical help, and that need might have induced her to make use of the service provided by the County, hoping that she could convince the EMS employees to take her where she wanted to go. Her physical condition, however, cannot be attributed to the County. Clearly, the County did not cause the medical emergency Ms. Wideman faced. Neither did her condition arise while she was in the County's custody or control.[9] Therefore, the county was under no affirmative constitutional duty to provide any particular type of emergency medical service for her.
 
 
 22
 Moreover, the fact that the County undertook to provide some ambulance service did not give rise to a constitutional duty to perform the particular service desired by this plaintiff. In Jackson v. Byrne, 738 F.2d 1443 (7th Cir.1984), the court held that the City of Chicago had no constitutional obligation to provide firemen, and therefore could not be held liable for their failure to respond because of a labor strike. The court expressly rejected the argument that the city acquired a continuing constitutional duty to provide fire services once it established itself as a provider of such services, concluding that such a position "would open the way for scrutiny by the federal courts of virtually every municipal decision to reallocate protective resources. Neither the Fourteenth Amendment nor Section 1983 was meant to give the federal courts such a role." Id. at 1447.[10] Because the Constitution does not require municipalities to provide any emergency medical services at all, it would be anomalous indeed to hold them liable for providing limited services which happen to be less extensive than a particular citizen may desire. Cf. Bradberry v. Pineallas County, 789 F.2d 1513, 1517 (11th Cir.1986).
 
 
 23
 Even if it could be argued that the County's conduct somehow heightened the peril Ms. Wideman faced, the plaintiffs still would not state a constitutional claim. In an analogous case, this court recognized the important distinction "between situations where the state actively places someone in danger and where the state fails to help someone already exposed to risk." Bradberry v. Pinellas County, 789 F.2d at 1517. The plaintiff in Bradberry, the mother of a swimmer who drowned off the Florida coast, brought an action under section 1983 alleging, inter alia, that the County violated her decedent's constitutional rights by inadequately training a lifeguard who unsuccessfully attempted to save him. Determining that the plaintiff failed to state a federal claim, the Bradberry court stated:
 
 
 24
 we do not believe that due process is implicated when the state fails to help someone already in danger. To hold otherwise, we would have to read into the Constitution the tort law principle that a rescue, once begun, must be carried out with due care. We decline to take such an extreme step.
 
 
 25
 Id. at 1517-18. The court further noted that even if the attempted rescue heightened the peril the decedent faced, "such conduct, which may amount to a tort cognizable under state law, does not constitute a constitutional deprivation of life without due process." Id. at 1518 (emphasis in original).
 
 
 26
 Similarly, we find that Ms. Wideman suffered no constitutional deprivation in this case. It is entirely possible that she may have meritorious state law claims against the County or its employees, such as her pendent allegations of false imprisonment, negligence, and intentional infliction of emotional distress. Remedy for such injuries, however, must be sought in state court under traditional tort-law principles. Baker v. McCollan, 463 U.S. at 146, 99 S.Ct. at 2695. Section 1983 does not make every tort committed by a state actor or under color of state law actionable in federal court. Paul v. Davis, 424 U.S. 693, 699-701, 96 S.Ct. 1155, 1159-60, 47 L.Ed.2d 405 (1976); Jackson v. City of Joliet, 715 F.2d at 1205. The relevant inquiry in this section 1983 action is limited to whether the plaintiffs have alleged the violation of a right secured by the United States Constitution. The Widemans have not, and therefore their complaint fails to state a claim under section 1983. The judgment of the district court is
 
 AFFIRMED.[11]
 
 
 [1]
 The plaintiffs' amended complaint alleged that their injuries resulted from the County's policy and practice of using its emergency vehicles only to take patients to County hospitals in order to keep its vehicles on the road and thereby increase profits
 
 
 [2]
 The district court expressed no opinion as to the plaintiffs' state law claims
 
 
 [3]
 The constitutional right alleged by the plaintiffs arguably may be characterized as the much more specific right to the medical care and services of their choice. Ms. Wideman was provided with medical care in this case; indeed, she was rushed to a hospital in an ambulance provided by the County. Her claim appears to be that she should have been able to direct the ambulance wherever she wanted to go. For purposes of our analysis, however, we shall consider the plaintiffs' alleged constitutional right as they have characterized it
 
 
 [4]
 The history of the fourteenth amendment clearly supports our conclusion:
 The men who framed the original Constitution and the Fourteenth Amendment were worried about government's oppressing the citizenry rather than about its failing to provide adequate social services. For such failures, political remedies (along with such legal remedies as states might see fit to provide in their own courts) were assumed to be adequate.
 DeShaney v. Winnebago County Dept. of Social Servs., 812 F.2d 298, 301 (7th Cir.1987).
 
 
 [5]
 Such deliberate indifference may be manifested "by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 104-05, 97 S.Ct. at 291 (footnotes omitted)
 
 
 [6]
 Another example of a special relationship creating constitutionally imposed duties, recently recognized in an en banc decision of this circuit, arises when a state involuntarily places a foster child in a foster home. In Taylor v. Ledbetter, 818 F.2d 791 (11th Cir.1987) (en banc), this court held that "a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution ... that the foster child may bring a section 1983 action for violation of fourteenth amendment rights." Taylor, 818 F.2d at 797 (footnote omitted). The court concluded that the relationship between state officials charged with carrying out the foster care program and the children in the program was "an important one involving substantial duties and, therefore, substantial rights." Id. at 798. Thus, the court allowed the child's representative to proceed in a section 1983 action under an Estelle v. Gamble analysis, alleging that the responsible state officials exhibited "deliberate indifference" to the child's physical safety
 
 
 [7]
 Given this rationale, these special relationship cases may be viewed on a continuum. At one extreme is the person whom the state has completely deprived of his liberty by either incarceration or institutionalization, such as a prison inmate, see Estelle, supra, or an involuntarily committed mental patient, see Youngberg, supra. The rights of the individual and the corresponding duties of the state are clearest and strongest in those contexts. Still protected, but somewhat further in along the continuum, are pretrial detainees, see Hamm, supra, and arrestees or suspects in police custody, see City of Revere, supra. At the opposite end of the continuum, however, are "members of the general public, living in the free society, and having no special custodial or other relationship with the state." Fox v. Custis, 712 F.2d 84, 88 (4th Cir.1983). Clearly, no right-duty relationship exists between those individuals and the state. See id.; Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982). In most cases, to establish a special relationship which creates a duty on the part of the state, the plaintiff must show that his situation lies closer to the "incarceration" or "custody" end of this continuum than it does to the "unrestricted" or "free" end
 
 
 [8]
 Although the record is silent on this point, the plaintiffs assert (for the first time on appeal) that the evidence at trial would show that Ms. Wideman was not informed that she would not be taken to Piedmont until she was already in the ambulance and in route to Shallowford. This allegation is essentially a claim that the EMS employees, for some reason, lured Ms. Wideman into the ambulance under false pretenses and kept her there against her will. While we express no opinion on whether such a bizarre practice, if proved, would violate the Constitution, we note that to recover on this theory against the County under section 1983, the Widemans would have had to allege that the County authorized just such a "custom or policy" of tricking people into its ambulances. See Monell, 436 U.S. at 694, 98 S.Ct. at 2037. If the plaintiffs' allegations really are that Ms. Wideman was misled or deceived, or that she relied to her detriment on the representations of County employees, then her claims clearly belong in state court. It stains credulity to believe that the County would have adopted such a perverse and senseless policy, but that is exactly what the plaintiffs would have had to alleged to recover under section 1983. At any rate, the Widemans have not alleged that such a policy existed; therefore we need not consider this strange proposition
 
 
 [9]
 The First Circuit has noted that
 [i]n the vast majority of cases which have found the existence of a "special relationship" between the state and the plaintiff giving rise to an affirmative duty of care or protection under the fourteenth amendment, the plaintiff has been in state custody or care at the time of the alleged injury.
 Estate of Gilmore, 787 F.2d at 720. Even if we were to accept that Ms. Wideman was in "state custody" once she got in the ambulance, the condition causing her alleged injury occurred before she submitted to that "custody." In fact, her preexisting physical condition was the very reason she voluntarily sought out the service in the first place.
 
 
 [10]
 Indeed, in any accident case one can argue that the police, the firemen, and other public safety workers should have done more to assist the accident victim. Jackson v. City of Joliet, 715 F.2d at 1205
 
 
 [11]
 Because of our disposition of this case, we need not address all of the specific allegations of error raised by the plaintiffs. We observe, however, that the proceedings in the district court took a bizarre turn when the court accepted the affidavits of the EMS employees in support of the defendants' motion for summary judgment, yet refused to permit the plaintiffs to depose those same individuals. This is not a proper practice. Nevertheless, it has no effect on our resolution of this case. The affidavits went to the question of whether the County had a custom or policy of limiting its ambulance service to certain hospitals. As our opinion indicates, we find this issue immaterial to the outcome. Our note here is merely to make clear that in affirming the judgment this court does not approve of the district court's handling of the affidavits and deposition requests