Matthew HAMILTON, by and through Lovelurn HAMILTON, his next friend; and Lovelurn Hamilton, Administratrix of the Estate of Kim Orlena Hamilton, Plaintiffs,

v.

Charles CANNON, in his official capacity as Sheriff of Macon County, Georgia; Ronald Duncan; Macon County, Georgia; The City of Montezuma, Georgia; Freddy Mallard; Lonnie Brown and Michael Tookes, Defendants.

No. CA–92–276–3–MAC(DF).

United States District Court,
M.D. Georgia,
Macon Division.

Sept. 13, 1994.

Larry David Wolfe, Stephen C. Andrews, Atlanta, GA, for plaintiffs.

George M. Peagler, Jr., Americus, GA, Thomas C. Alexander, Thomas F. Richardson, Kenneth M. Brock, Macon, GA, for defendants.

FITZPATRICK, District Judge.

Before the court are three motions for summary judgment. Summary judgment is proper "if ... there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For purposes of summary judgment the district court resolves all reasonable doubts about the facts in favor of the nonmoving party. *Warrior Tombigbee Transport Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). However, the moving party may provide affirmative evidence demonstrating the inability of the nonmoving party to prove its case at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is mandated if a party cannot establish the existence of essential elements upon which they carry the burden of proof. 477 U.S. 317, 106 S.Ct. 2548.

## FINDINGS OF FACT

On July 6, 1990, Kim Orlena Hamilton accompanied her sister and a friend to the Hill Street swimming pool in Montezuma,

Georgia. By wearing shorts and a shirt Kim made it apparent that she did not wish to get wet, but a boisterous group of swimmers ignored the obvious and threw her into the water anyway.[1] Though such "dunkings" are normally harmless fun, this time the result of the prank was a young woman's death.

The lawsuit which spawned the present motions constitutes a struggle to determine who is responsible for Kim's unfortunate and untimely demise. Among the targets for blame is the City of Montezuma, which operates two pools: one at Hill Street and another at Pool Street. Although the Pool Street facility is manned by two full time lifeguards certified in lifesaving techniques, Montezuma hired only one person to manage and lifeguard the Hill Street pool. This individual, Lonnie Brown, is over sixty years old, has diabetes, a knee weak from surgery, and lacks three toes on his left foot. Moreover, Mr. Brown received no lifesaving training after 1985, and he did not enter the water at the Hill Street pool once in the seven years before Kim's accident.[2]

Recognizing limitations upon his lifesaving capacity and his need for further assistance in managing the pool, Mr. Brown hired Michael Tookes to serve as a lifeguard. However, Tookes had no formal lifeguard training, and he never received any instructions or direction that would assist him should a drowning or other injury occur at the pool. Thus, Tookes saw the horseplay that resulted in Kim's dunking but could not stop it. After the dunking, when Kim collapsed as she tried to get out of the water, Tookes only knew to place Kim at the edge of the pool. Were it not for Sharon Simpson, a private citizen trained in cardiopulmonary resuscitation who, incidentally, happened to be at the pool, there might have been no attempt to assist Kim for many minutes.

Simpson was assisted by her cousin with Kim's CPR, and Tookes stood by to wipe Kim's mouth. Mr. Brown did not participate. After Simpson initiated CPR Kim began aspirating and appeared to revive. Kim held her head up, began to cough, and moved her arm. Simpson felt a pulse and saw Kim trying to respond by moving her eyes. Kim also moved her head in response to hearing her name, and she began shallow breathing. Although not trained in lifesaving, it appeared to Tookes as if Kim was recovering and in no danger of dying.

While this rescue attempt was underway, Macon County Deputy Sheriff Ronald Duncan arrived on the scene. Duncan ordered everyone to clear the area around Kim, and he specifically ordered the rescuers away in a loud and angry voice. Duncan then examined Kim, but he did not initiate CPR or undertake any action on her behalf.[3] Once Simpson realized that Duncan had no intention of undertaking any rescue efforts she ran home to procure her Red Cross certification card. Simpson was gone approximately five minutes, and during this time neither Brown, Tookes, Duncan or the Montezuma Police Officers that showed up during the interim took any steps to assist Kim.

Simpson recommenced CPR after her return, but she received no indications that Kim was responding. Soon thereafter emergency personnel arrived yet, despite their further attempts to save the young woman's life, Kim had already passed the point where medical assistance could be of benefit.

Various theories having been advanced by the parties, the court is now called upon to determine the legal viability of the Plaintiffs' negligence and § 1983 claims.

1. Kim also wore panties and a bra, was using a sanitary napkin, and had not healed from recent childbirth. While other swimmers could not know these things, this private information serves to strengthen the inference that Kim did not wish to swim.

2. Mr. Brown's duties at the pool consisted of collecting admission fees, maintaining pool equipment and selling snacks.

3. Duncan believed that emergency medical technicians would arrive on the scene immediately after him, but the technicians instead went to the Pool Street facility and so were delayed for several more minutes. The technicians were not aware that there was a public pool on Hill Street until they were informed of this fact while at the Pool Street pool.

## CONCLUSIONS OF LAW [4]

### I. Federal Claims

#### A. Liability of Macon County

■ Defendant Macon County first asserts that it cannot be held liable for the actions of Sheriff Cannon. The determination as to whether a county may be held liable for the actions of its sheriff depends upon the breadth of the authority granted to the county by the state legislature. For example, in *Swint v. City of Wadley,* 5 F.3d 1435 (11th Cir.1993), the Court of Appeals determined that an Alabama County Commission cannot be liable for an Alabama Sheriff's law enforcement actions under 42 U.S.C. § 1983 because

> [A]labama counties are "authorized to do only those things permitted or directed by the legislature of Alabama," *Lockridge v. Etowah County Comm'n.,* 460 So.2d 1361, 1363 (Ala.Civ.App.1984), and because the State has not assigned the counties any law enforcement authority, the sheriff is not exercising county power. . . .

*Id.,* at 1450–51.

*Ryals v. Mobile County Sheriff's Dep't.,* 839 F.Supp. 25 (S.D.Ala.1993), relied upon *Swint* and extended the Court of Appeals' interpretation of Alabama's statutory scheme to its logical conclusion by determining that the separation of authority between county and sheriff in Alabama also precludes the imposition of any Title VII liability upon a county for the unfair employment practices of a sheriff. Thus, under Alabama law counties and sheriffs must be treated as wholly separate entities in most circumstances, and the actions of one cannot be imputed to the other.

■ Since federal rights are often sensitive to the dictates of state legislation, it follows that liabilities established in one state may not correspond to those found in other states. In *Lucas v. O'Loughlin,* 831 F.2d 232 (11th Cir.1987), the Court of Appeals determined that, under Florida law, the employment actions of a sheriff are also the employment actions of his or her county for Title VII purposes:

> Although elected by virtue of state law, he was elected to serve the county as sheriff. In that capacity, he had absolute authority over the appointment and control of his deputies. His and their salaries were paid by local taxation and according to a budget approved by the county commissioners. We conclude, therefore, that his act was the act of St. Johns County.

*Id.,* at 235. Applying the logic of *Ryals* to *Lucas,* it appears that a Florida county would incur liability for its sheriff's actions in a § 1983 suit as well.

In Georgia the relationship between county and sheriff more closely resembles that found in Florida. *Johnson v. Ballard,* 644 F.Supp. 333 (N.D.Ga.1986), determined that Georgia counties may be liable for the actions of their sheriffs in § 1983 and Title VII employment actions, and the legislative connections between sheriff and county are such that § 1983 liability easily extends beyond the employment context. In Georgia a sheriff must be a resident of the county where he or she holds office. O.C.G.A. § 15–16–1. If the sheriff does not have proper law enforcement experience when he or she takes office funds for training courses will be provided by federal and state revenues, but these funds first pass through county coffers before reaching the sheriff. O.C.G.A. § 15–16–3. While the sheriff must post a bond in accordance with state law, the county may increase the amount of this bond by local Act. O.C.G.A. § 15–16–5. The sheriff may be charged with the duty to receive, confine, feed and care for persons charged with violating county ordinances. O.C.G.A. § 15–16–10. If the sheriff elects to provide police services to local municipalities then the county is entitled to reimbursement for all costs incurred in this endeavor, and the funds remunerated become county funds. O.C.G.A. § 15–16–15. The sheriff earns an annual salary paid from county funds, and he or she may be provided a vehicle allowance from these same funds. O.C.G.A. § 15–16–20. Fees for certain sheriff's services, like feed-

---

**4.** All facts discussed below and not included above are hereby adopted and incorporated as findings of fact.

ing prisoners, effectuating arrests, and any costs associated with felony cases are provided by the county. O.C.G.A. § 15–16–21. Cash bonds held by the sheriff may be placed in county depositories, and any interest received from these bonds may be periodically transferred from the depository into general county funds. O.C.G.A. § 15–16–27. Thus, Georgia counties and sheriffs appear inextricably intertwined, and the acts of the sheriff are therefore the acts of the county.

■ Regardless of its liability for the acts of its sheriff, Macon County also asserts that there has been no violation of a federally protected right that can give rise to liability for any party. However, federal constitutional duties arise when a governmental body "exercises a significant degree of custody or control over an individual" and place the person "in a worse situation than he would have been had the government not acted at all." *Wideman v. Shallowford Community Hospital, Inc.,* 826 F.2d 1030, 1035 (11th Cir.1987). In the instant action there can be no doubt that Plaintiffs' allegations, if true, comprise a violation of a federally protected right:

> Such a situation could arise by virtue of the state affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid.... The key concept is the exercise of coercion, dominion, or restraint by the state.

*Id.*

### B. Liability of Montezuma, Tookes and Brown

■ Messrs. Brown and Tookes, and the City of Montezuma, believe that they enjoy immunity from constitutional claims to the extent not waived by liability insurance, and they cite Georgia law in support of this proposition. However, their argument is unpersuasive since the United States Supreme Court has made it patently clear that:

[T]he municipality's "governmental" immunity is obviously abrogated by the sovereign's enactment of a statute making it amenable to suit. Section 1983 was just such a statute. By including municipalities within the class of "persons" subject to liability for violations of the Federal Constitution and laws, Congress—the supreme sovereign on matters of federal law—abolished whatever vestige of the State's sovereign immunity the municipality possessed.

*Owen v. City of Independence,* 445 U.S. 622, 647–48, 100 S.Ct. 1398, 1413, 63 L.Ed.2d 673 (1980).

■ Immunity aside, Montezuma further contends that it assumes no liability for a failure to train lifeguards adequately. On this point the City appears correct, as reflected in *Bradbury v. Pinellas County,* 789 F.2d 1513 (11th Cir.1986):

> In the present case, the plaintiffs alleged that Pinellas County was grossly negligent because it inadequately trained lifeguards and one of those lifeguards proximately caused the death of Kenny Ray Thomas. We find that, on these facts, this allegation is insufficient to state a claim under Section § 1983. It is beyond peradventure that § 1983 did not make every tort committed under color of state law actionable in federal court.... Pinellas County's alleged failure to adequately train its lifeguards may have been one of the causes of Kenny Ray Thomas' death, but it did not deprive him of any right secured by the federal Constitution.

*Id.,* at 1517. Thus the City cannot be liable for Brown's or Tookes' inadequate training, and neither can Brown be held liable for Tookes' inadequate training.

■ Notwithstanding the above, Tookes cannot be released from this § 1983 action because it may be that he established a special relationship with the decedent when he lifted her from the water.[5] Furthermore, since Tookes' actions violated a clearly established constitutional right defined in *Wideman* he is not entitled to qualified immunity.

---

**5.** Of course the burden remains upon Plaintiffs to establish that the decedent was placed in greater danger through Tookes' contact.

Applying the test enumerated in *Courson v. McMillian,* 939 F.2d 1479 (11th Cir.1991), it appears that the decedent's right to affirmative assistance from Tookes was clearly established, and the contours of this right were plain enough that Tookes could understand that a failure to act amounted to a constitutional violation. There is a genuine issue of material fact as to whether Tookes' subsequent actions adequately satisfied this federal duty so, assuming for purposes of summary judgment that his actions were insufficient, Tookes is not entitled to qualified immunity.

■ Brown's claim of qualified immunity must be viewed somewhat differently. Since the facts in record indicate that Brown exercised no control over the decedent's well-being, affirmatively indicated his dominion over her or otherwise interfered with available sources of private aid he cannot be said to have violated a clearly established constitutional right defined in *Wideman.* The only other possibly protected right suggested thus far is a duty to rescue, but such a duty is not recognized as a constitutional right within the federal system. *See, e.g., Jackson v. Byrne,* 738 F.2d 1443 (7th Cir.1984) (firefighters are under no constitutional duty to save lives absent a special relationship). Lacking a clearly established right the *Courson* test cannot be satisfied, and so Brown is entitled to qualified immunity.

### C. Liability of Duncan, Cannon and the Sheriff's Department

■ If the allegations of Plaintiffs' complaint prove true then there is no doubting that Duncan violated a clearly established constitutional right outlined in *Wideman,* and as such he is not entitled to assert qualified immunity as a bar to this action. Again applying the test enumerated in *Courson* we see that the decedent's right to affirmative assistance was clearly established, and the contours of this right were plain enough for Duncan to understand that his actions violated the decedent's right. Since there is a genuine issue of material fact as to whether

Duncan did or did not order rescuers to abandon their attempt to save the decedent, and since it must be assumed at this time that he did so interfere, then Duncan knew or should have known that he was assuming an affirmative obligation for the decedent's well-being. As such he is not entitled to claim qualified immunity either.[6]

The final § 1983 argument presented by these defendants is that there was no violation of a federally protected right but, as discussed in the conclusions on the County's motion for summary judgment, there has been a violation of a constitutionally protected right specified in *Wideman* if the allegations of the complaint prove true.

## II. State Law Negligence Claims

Each of the defendants to this action state their own reasons why there can be no negligence claim for the events leading to this litigation, and the plaintiffs respond to these challenges in a timely and complete manner. However, the court does not reach a discussion of causation, contributory negligence or other, similar legal issues because it is stymied at the outset by *City of Rome v. Jordan,* 263 Ga. 26, 426 S.E.2d 861 (1993).

■ Simply stated, *Jordan* requires the establishment of a special relationship with the victim before any duty may be imposed upon the municipality, and three hurdles must be met before this relationship is considered established:

(1) an explicit assurance by the municipality, through promises or actions, that it would act on behalf of the injured party;

(2) knowledge on the part of the municipality that inaction could lead to harm; and,

(3) justifiable and detrimental reliance by the injured party on the municipality's affirmative undertaking.

*Jordan,* 426 S.E.2d, at 863.

Assuming, *arguendo,* that Tookes and Duncan both explicitly assured action with the knowledge that inaction could lead to

---

6. Defendants also contend that Sheriff Cannon is entitled to qualified immunity, but as he is sued only in his official capacity this issue is moot.

*See, e.g., Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

harm, it is nevertheless difficult to understand what the decedent could have done to detrimentally rely upon these assurances. This must be said whether she was conscious or unconscious at the time, for in either circumstance she was incapable of taking any affirmative act that might signify reliance. Therefore the decedent did not establish a special relationship with any municipality, and therefore negligence cannot be imputed upon either municipal defendant.

Georgia's Supreme Court asserts that one desired effect of *Jordan* is to maintain municipal accountability for negligence "to some degree," but it appears as if the *de facto* consequence of this special relationship test is instead absolute immunity by some other name. *Jordan*, 426 S.E.2d, at 863. Plainly this was not the intent of that Court: the reason a fourth element was not incorporated into the test was to avoid situations where municipalities might be "free from duty solely because of the limitations and restraints on the injured party...." *Id.* Thus, it appears as if that Court wished to institute an immunity standard similar to that employed within the federal system, but unforeseeable circumstances like those present in the instant litigation precluded fulfillment of this goal.

As Georgia law now stands it appears that municipalities can be held liable for their negligence only if the injured party is conscious and communicating, but once the victim becomes incapable of expressing assent municipal liability ceases. Unfair as this interpretation could prove to be, without further guidance this court is at a loss to see how municipalities could be held liable for events like the ones described herein. Were the third prong of the *Jordan* test modified so as to require affirmative rejection of assistance by the injured party, or were the Georgia Supreme Court to introduce a theory of implied reliance, then this court would feel compelled to deny these defendants' request for summary judgment. As the law presently exists, however, the motion must be granted insofar as it involves state negligence claims.

## CONCLUSION

Accordingly, for the foregoing reasons, Defendant Macon County's motion for summary judgment is hereby **DENIED** as to federal claims and **GRANTED** as to state claims. Defendants Montezuma, Brown and Tookes' motion for summary judgment is **GRANTED** as to any failure to train. Defendant Brown's motion, insofar as it concerns qualified immunity, is hereby **GRANTED,** and Tookes' motion on the same issue is hereby **DENIED.** Montezuma, Brown and Tookes apparently enjoy immunity from state negligence claims, and so their motion for summary judgment is hereby **GRANTED** insofar as the negligence cause of action is concerned. Defendants Duncan, Cannon and the Sheriff's Department's motion is also **DENIED** as to federal claims and **GRANTED** as to state claims.

This court is of the opinion that governmental immunity on state negligence claims is a controlling question of law as to which there is substantial grounds for difference of opinion. An immediate appeal from this order may materially advance the ultimate termination of this litigation. Therefore, pursuant to 28 U.S.C. § 1292(b), the parties have ten days from the date of entry of this order in which to file their application for appeal.

SO ORDERED.