United States Court of Appeals,

Eleventh Circuit.

No. 97-9214.

Yasmin SANTAMORENA, individually and as next friend of H.S., a minor, Plaintiff-Appellant,

v.

GEORGIA MILITARY COLLEGE, Peter J. Boylan, General, et al., Defendants-Appellees.

July 31, 1998.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:97-CV-4-JOF), J. Owen Forrester, Judge.

Before EDMONDSON and BIRCH, Circuit Judges, and LAWSON*, District Judge.

EDMONDSON, Circuit Judge:

Plaintiff appeals the district court's dismissal of her claim—a claim brought on behalf of Plaintiff and Plaintiff's minor daughter—that Defendants, Georgia Military College ("GMC") and several of its officials, violated Plaintiff's and her daughter's substantive due process rights. Because we agree with the district court that the individual Defendants are entitled to qualified immunity, we affirm.[1]

*Background*

---

*Honorable Hugh Lawson, U.S. District Judge for the Middle District of Georgia, sitting by designation.

[1]Plaintiff originally sued both the institution, Georgia Military College, and several of its officials (in both their official and individual capacities). The district court granted Defendants' motion to dismiss, concluding that the institution (and the Defendants sued in their official capacities) was entitled to sovereign immunity and that the Defendants, sued in their individual capacities, were entitled to qualified immunity. Plaintiff appeals only the determination by the district court that the individual Defendants were entitled to qualified immunity.

GMC is a state-run institution that serves as both a high school and a college. Plaintiff's daughter, H.S., was a 13-year-old high school freshman enrolled at GMC.[2] According to GMC policy, high school freshmen were required to stay on campus and to live in the barracks for the first four weeks of school. During this period, only the high school was in session; but GMC's college football team was on campus for pre-season training.

Before enrolling H.S. at GMC, H.S.'s parents inquired about security on the campus. In response to these concerns, several school officials represented to H.S.'s parents that H.S. would be adequately protected. School officials specifically told H.S.'s parents these things: that H.S. would be housed in a room near a school official's—Defendant Major Banks's—living quarters; that an adult supervisor would be assigned to H.S.'s barracks and available at all times; that a piece of sliding cardboard would be placed on the inside of the observation window in the door to H.S.'s room so that she could observe visitors; that security personnel would be present in the barracks to monitor visitors; and that a nightly bed check would be conducted to ensure that all students were in their rooms by 10:00 p.m.

About one week after H.S. arrived at GMC, she and her roommate (the other female high school student at GMC) were moved to a room in the opposite wing from the room in which the two were originally placed. No other school personnel or students lived in that wing of the barracks, and this new room was some distance from Major Banks's living quarters. In addition, the new room had a wooden board nailed to the observation window of the door—not a piece of sliding cardboard—which prevented H.S. from observing and identifying visitors.

_____

[2]H.S. was one of only two female students enrolled in GMC's high school program.

On 1 September 1995, after being moved to the new room, H.S. was awakened by a knock on her door. H.S. opened the door and allowed GMC college football player, Kareem Holmes, to enter her room. Holmes then raped H.S.

Plaintiff, the parent of H.S., asserts that on the night of the attack, no security personnel were present to monitor the barracks, no bed check was conducted, and all supervisory responsibility for the barracks had been delegated to Defendant Major Banks. Major Banks was left in charge because Lt. Diane Ortega, the official actually assigned to supervise the main barracks and the female hall on the night of the incident, was not on campus.

Plaintiff filed suit under 42 U.S.C. § 1983. Plaintiff's claim is based on the rape of H.S. by a private third party on the campus of GMC while H.S. was a resident high school student there. Plaintiff alleges that GMC and GMC officials—by failing to protect H.S. from harm by a private actor (Holmes)—violated H.S.'s Fourteenth Amendment rights to personal security and to physical integrity and violated Plaintiff's related right to maintain family integrity.[3] The district court dismissed the complaint, before discovery, concluding in relevant part that the individual Defendants were entitled to qualified immunity. Plaintiff appeals the dismissal of her complaint against the individual Defendants—General Peter J. Boylan, Colonel Frederick Van Horn, Major Walter Banks, and Sergeant Larry Swint[4]—challenging the district court's conclusion that these Defendants were entitled to qualified immunity.

---

[3]The alleged constitutional violations are premised on the existence of a constitutional duty—owed to H.S. (and secondarily to Plaintiff) by the school officials—to protect H.S. from private third parties.

[4]All individual Defendants were teachers or administrators at GMC at the time of the incident.

*Discussion*

"Qualified immunity protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (internal quotations and citations omitted).[5] To overcome this immunity, Plaintiff has the burden of pointing to case law which "pre-date[s] the offic[ial]'s alleged improper conduct, involve[s] materially similar facts, and "truly compel[s]' the conclusion that the plaintiff had a right under federal law."[6] *Ensley v. Soper,* 142 F.3d 1402, 1406 (11th Cir.1998) (citing *Lassiter,* 28 F.3d at 1150).

Defendants "assert[ed] the defense of qualified immunity in a Rule 12(b)(6) motion to dismiss, and they are entitled to qualified immunity at this stage in the proceedings if [Plaintiff's] complaint fails to allege a violation of a clearly established constitutional right." *Williams v. Alabama State Univ.,* 102 F.3d 1179, 1182 (11th Cir.1997). Whether the complaint alleges the violation of a clearly established right is a question of law, which we review *de novo. See id.* In

---

[5]No party disputes that Defendants were performing discretionary functions in relation to the events of this case.

[6]This statement summarizes the usual rule and the law that applies in this case. We can imagine an exceptional case where "the words of a federal statute or federal constitutional provision will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity even in the absence of case law," *Lassiter,* 28 F.3d at 1150 n. 4, or where "a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct in question," *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997). But these exceptional cases rarely arise. And we are not faced with such an exceptional case: given the circumstances of this case, the Due Process Clause does not provide the essential, obvious clarity.

4

deciding this case, we accept all facts alleged in the complaint as true and draw all reasonable inferences in favor of the nonmoving party, Plaintiff. *See id.*

Plaintiff recognizes that her complaint, which is premised on a violation of the Due Process Clause,[7] is based on the rape of her daughter, not by a school official, but by a private third party. And, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). "As a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 1004.[8]

But "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* Where "the State takes a person into its custody and holds him there against his will ... the Constitution imposes upon [the State] a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 1005. Thus, a duty may be imposed on States to protect involuntarily committed mental patients, prisoners, and involuntarily placed foster children. *See, e.g., Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (mental patients); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (prisoners); *Taylor v. Ledbetter,* 818 F.2d 791 (11th Cir.1987) (foster children).

---

[7]The Due Process Clause of the Fourteenth Amendment provides, in pertinent part, that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

[8]We note that the absence of a constitutional duty to protect does not negate the possibility that state law duties might be owed to individuals by government actors: state tort actions might apply.

The question presented in this case is whether, given the status of the preexisting law, the Defendants, at the pertinent time, clearly owed Plaintiff or H.S. some constitutional duty to protect H.S. based on the voluntary, custodial relationship between H.S. and GMC. So, we consider cases where we have talked about the possibility of a constitutional duty when the State has a "special relationship" with either the victim or the perpetrator. *See Wyke v. Polk County Sch. Bd.,* 129 F.3d 560 (11th Cir.1997); *Mitchell v. Duval County Sch. Bd.,* 107 F.3d 837 (11th Cir.1997); *Cornelius v. Town of Highland Lake,* 880 F.2d 348 (11th Cir.1989).

"The contours of what constitutes a "special relationship' between a [State institution], acting through its officials, and its citizens are hazy and indistinct." *Wideman v. Shallowford Comm. Hosp., Inc.,* 826 F.2d 1030, 1035 (11th Cir.1987) (quoting *Ellsworth v. City of Racine,* 774 F.2d 182, 185 (7th Cir.1985)). During oral argument, Plaintiff's counsel acknowledged that whether a voluntary, instead of an involuntary, custodial arrangement between the State and a citizen could give rise to a special relationship, and thus a constitutional duty, remains "unclear" in this circuit. But still Plaintiff argues that the preexisting law was somehow so clearly established that Defendants should not be protected by qualified immunity.

Plaintiff points us to three cases, which Plaintiff claims clearly established that GMC owed a constitutional duty to H.S.: *Taylor v. Ledbetter,* 818 F.2d 791 (11th Cir.1987); *Cornelius v. Town of Highland Lake,* 880 F.2d 348 (11th Cir.1989); and *Spivey v. Elliott,* 29 F.3d 1522 (11th Cir.1994). None of these cases, however, provide the "bright line" necessary to delineate the concrete circumstances in which officials will violate the Constitution. *See Lassiter,* 28 F.3d at 1150 ("If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.") (internal quotations and citations omitted).

When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar.... Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.[9]

Lassiter, 28 F.3d at 1150 (quoting Adams v. St. Lucie County Sheriff's Dep't, 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), approved en banc, 998 F.2d 923 (11th Cir.1993)).

Given the facts, the cases relied on by Plaintiff are not materially similar to the case before us and would have required Defendants to draw inferences—inferences of highly debatable validity—to reach the conclusion that H.S. (and secondarily Plaintiff) was owed a constitutional duty. These cases do not address the situation in this case: where an individual is voluntarily in the custody of the State[10] or where the State represented that it would provide the individual with security. *Cf. Taylor,* 818 F.2d 791 (The court wrote these words about involuntary custody in foster homes: "The liberty interest in this case is analogous to the liberty interest in *Youngberg.* In both cases, the state *involuntarily* placed the person in a custodial environment, and in both cases, the person is unable to seek alternative living arrangements.") (emphasis added); *Cornelius,* 880 F.2d 348;[11] *Spivey,* 29 F.3d 1522, *withdrawn, Spivey v. Elliott,* 41 F.3d 1497 (11th Cir.1995) (*Spivey II*

---

[9]Plaintiff argues that this circuit's qualified immunity analysis, generally requiring materially similar cases to establish clearly a constitutional right, is no longer good law after *Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432. We have already reaffirmed our qualified immunity analysis in the light of *Lanier. See Jenkins v. Talladega City Bd. of Educ.,* 115 F.3d 821, 825 n. 3 (11th Cir.1997) (en banc) (specifically discussing the impact of *Lanier* on the law of the circuit). "The principles of qualified immunity set out in *Lassiter v. Alabama A & M Univ., ...* continue to be the guiding directives for deciding cases involving the question of a state actor's entitlement to qualified immunity in this circuit." *Id.* at 823.

[10]We understand that presence at a custodial school may not be a voluntary decision on the part of the minor student. But only restraints of freedom imposed by the State, not by a student's parents, can give rise to a constitutional duty requiring the State to protect that student.

[11]In *Cornelius,* the court determined that a special relationship might exist between the town and a town employee, the town clerk, where the town knowingly placed the town clerk in danger

).[12] Thus, these cases did not (and do not today) clearly establish that Defendants owed Plaintiff or H.S. a federal constitutional duty to protect H.S. from the incident in this case.

Given their facts, the cited precedents gave much too little guidance. We cannot properly require Defendants in this case to have drawn inferences when the facts of the existing cases were considerably different from the circumstances facing these particular Defendants.

---

by allowing poorly supervised prison labor to work near the town clerk's place of employment, the town hall. Later panels have questioned the survival of *Cornelius,* and its special danger theory, following the Supreme Court's decision in *Collins v. City of Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 1070-71, 117 L.Ed.2d 261 (1992) (employment relationship alone cannot give rise to constitutional duty to protect). *See Mitchell,* 107 F.3d at 839 n. 3 ("*Cornelius* may not have survived *Collins* ...."); *Wright v. Lovin,* 32 F.3d 538, 541 n. 1 (11th Cir.1994) (same). Because *Cornelius* has significantly different facts and its validity has been expressly questioned in our later opinions, we cannot let *Cornelius* be the case that clearly established H.S.'s right to the State's protection: *Cornelius* did not clarify the law to the point that all reasonable school officials in Defendants' place must have known they were subject to a constitutional duty to protect H.S.

> The confusion created by the Supreme Court's intervening decision in *Collins,* and by later opinions by this court questioning *Cornelius,* presents the legal possibility that law, which may have once been clear, can become unclear later. The nature of the law is not always to move from unsettled to settled. Although one of our decisions may not be expressly overruled, later cases—at least Supreme Court cases—may bring its reasoning or holding into such doubt that the elements set out in the case are no longer clearly established for purposes of qualified immunity.

> Given the confusion surrounding the soundness of *Cornelius* and considering its facts, we can locate no case (and Plaintiff has pointed us to no case) that is sufficiently factually similar to this case and that would have made it clear to Defendants at the time (or to us now) that Defendants placed H.S. in a position of danger which imposed upon them a constitutional duty to protect H.S.

[12]Plaintiff relies on *Spivey,* 29 F.3d 1522. But the portion of that opinion on which Plaintiff relies was withdrawn. *See Spivey II,* 41 F.3d at 1499 ("[I]n the interest of efficiency and collegiality on this Court, where there are differing views as to the substantive right, this panel has chosen to withdraw all of its prior opinion which relates to whether the complaint alleges a constitutional right so that the opinion will serve as no precedent on that issue.").

Furthermore, some preexisting case law may have particularly suggested to Defendants (or to be more precise, to every reasonable school official standing in Defendants' place) that no duty would arise in a voluntary situation, despite representations by Defendants that protection would be provided. *See DeShaney,* 109 S.Ct. at 1005-06 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or *from its expressions of intent to help him,* but from the limitation which it has *imposed* on his freedom to act on his own behalf.") (emphasis added). "Unless a government agent's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Lassiter,* 28 F.3d at 1149. Defendants were not obviously violating Plaintiff's or H.S.'s clearly established rights in this case.

Because Plaintiff's complaint fails to allege the violation of a clearly established constitutional right, the district court correctly granted Defendants' motions to dismiss on grounds of qualified immunity. We, given the status of the preexisting law, view it as obvious that Defendants are entitled to qualified immunity.

But we do acknowledge that the existence or nonexistence of a constitutional right (or duty) in this case presents a perplexing question: a question that we—in part, because it cannot be easily answered—decline to answer at this time. To overcome qualified immunity, Plaintiff must show both (1) that Defendants violated a federal constitutional right and (2) that the right was already clearly established at the time of the violation. *See Spivey II,* 41 F.3d at 1499. "[A] negative decision on either prevents the plaintiff from going forward." *Id.* So, to answer the other question is unnecessary to decide the case. Thus, "[o]nce there has been a determination that there is no "clearly established' right, the parties can accomplish little in pursuing the question of whether there

9

is a right at all .... [because t]hose who differ with the decision of the court could write it off as dictum." *Id.*[13]

A Supreme Court opinion recently suggested that the "better approach"—in cases involving the defense of qualified immunity—might be to decide whether the contended for constitutional right exists at all before determining whether the right was, at the pertinent time, clearly established. *See County of Sacramento v. Lewis,* --- U.S. ----, ---- n. 5, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998) (citing *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991)) ("[T]he *better approach* to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. *Normally,* it is only then that a court *should* ask whether the right allegedly implicated was clearly established at the time of the events in question.") (emphasis added).

---

[13]We have already stated that "[t]he law cannot be established by dicta. Dicta is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law." *Hamilton v. Cannon,* 80 F.3d 1525, 1530 (11th Cir.1996); *see also In re United States,* 60 F.3d 729, 731 (11th Cir.1995) ("Statements of dicta are not part of the law of the case."); *United States v. Teague,* 953 F.2d 1525, 1535 (11th Cir.1992)("[D]icta is inherently unreliable for what a court will do once faced with a question squarely and once its best thoughts, along with briefs and oral argument, are focused on the precise issue.") (Edmondson, J., concurring). The reasons for avoiding dicta were briefly expressed by the Supreme Court early in our nation's jurisprudence:

> It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Cohens v. Virginia,* 6 Wheat. 264, 399, 5 L.Ed. 257 (1821).

We do not understand this footnote as an absolute requirement that lower courts must always follow this "normally" "better approach." In *County of Sacramento,* the district court decided the case strictly on qualified immunity grounds, that is, on the ground of the unsettled nature of the law; but the Supreme Court never said the district court erred. And if the Supreme Court intended to impose an absolute requirement on lower courts always to address the merits of constitutional issues even where qualified immunity obviously applies and readily resolves the case, we believe the Supreme Court would have said so more directly.[14]

At least in situations like this one—(1) where the existence of a constitutional right (or duty) presents a perplexing question, (2) where the alleged right obviously was not already clearly established, and (3) where the qualified immunity determination does end the whole case—it remains appropriate, and sometimes preferable, to stop at the determination that the right, if any, was

---

[14]Several separate opinions were written in *County of Sacramento.* As we understand it, four Justices did not endorse footnote 5 or expressly stressed that footnote 5 was no blanket rule. *See County of Sacramento,* --- U.S. at ----, 118 S.Ct. at 1722 (Breyer, J., concurring) and --- U.S. at ----, 118 S.Ct. at 1723 (Stevens, J., concurring) (specifically discussing footnote 5); *see also* --- U.S. at ---- - ----, 118 S.Ct. at 1723-25 (Scalia, J., with whom Thomas, J., joins, concurring in judgment only). Although a majority of the Justices did join in Justice Souter's opinion (including footnote 5) for the Court, we cannot say that footnote 5 is doubtlessly a holding of the Court. *See generally Crawford-El v. Britton,* --- U.S. ----, ----, 118 S.Ct. 1584, 1590, 140 L.Ed.2d 759 (1998) (not everything set forth in an opinion is a holding of the case).

> We do recognize, however, that the Supreme Court has the power to supervise lower federal courts through special statements that go beyond the holding of a case; and the Supreme Court has, on occasion, invoked such supervisory powers. *See, e.g., Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 551 n. 2, 98 L.Ed.2d 568 (1988); *Cheff v. Schnackenberg,* 384 U.S. 373, 86 S.Ct. 1523, 1526, 16 L.Ed.2d 629 (1966). In footnote 5, the supervisory powers are not specifically invoked.

> But even if footnote 5 is a binding judicial pronouncement or a binding supervisory instruction, we—given the footnote's own words—do not understand it to be a strict rule with no exceptions.

not clearly established.[15] "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988); *see also Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985); *In re Snyder,* 472 U.S. 634, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504 (1985); *Superintendent, Massachusetts Correctional Instit., Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 2772, 86 L.Ed.2d 356 (1985); *Spivey II,* 41 F.3d at 1499 (decided after *Siegert v. Gilley* ) ("[A] determination of whether a right is clearly established will always require no more, and will often require less, analysis than is required to decide whether the allegedly violated constitutional right actually exists in the first place. Moreover, deciding the case on the "clear establishment' element comports with the well-established principle disfavoring reaching substantive constitutional issues if a case can be resolved on other grounds."). "[T]his self-imposed limitation on the exercise of the Court's jurisdiction has an importance to the institution that transcends the significance of particular controversies." *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982).

The Supreme Court looked at these arguments for avoiding the merits of constitutional issues when the Court, in *County of Sacramento,* said that a decision on those merits was normally the "better approach." Still we conclude the Supreme Court did not mean to nullify all the traditional restraint principles or to take away all our discretion to analyze particular qualified immunity cases,

---

[15]We do not say that the presence of these three features in the case at hand distinguishes it from *County of Sacramento.* One could argue that the same features were presented by *County of Sacramento.* We just say that these features make the case a fit subject for judicial discretion when it comes to fashioning the analysis: the kind of cases in which sometimes to decide the constitutional issue and sometimes not, depending on a wide array of other considerations.

12

involving perplexing constitutional issues, without first deciding whether the constitutional right exists.  We think the Supreme Court was telling us that, notwithstanding the usual restraint arguments, sometimes the courts can and should decide the constitutional issues;  and we will but—because we believe the Supreme Court has left us with some discretion—not today.[16]

Because we conclude that Plaintiff and H.S. were owed no clearly established constitutional duty by Defendants at the time of the incident, Defendants are entitled to qualified immunity.

AFFIRMED.

---

[16]Refraining (until truly necessary) from deciding—in qualified immunity cases—the more perplexing federal law issues will not inevitably preclude the law in due course from becoming clearly established.  Suits seeking injunctions, suits against local governments, and certain criminal proceedings can settle the law.  And, in circumstances where the right allegedly violated is one based in federal statute, Congress can add the necessary clarity to the law.  Thus, our avoidance of a constitutional issue in a specific case, like this one, does not prevent the law from ever becoming clearly established;  and if we chose to address the perplexing constitutional issue, we would not necessarily add clarity to the law because such a decision could be viewed as mere uncontrolling dicta.