John ROES 1 through 5 and Jane Roe through their next best friend and attorney ad-litem David Bazerman, Plaintiffs,

v.

FLORIDA DEPARTMENT OF CHILDREN & FAMILY SERVICES; Kathleen Kearney, in her official capacity; Margaret Andrews, individually; Cynthia McCarthy, individually; Elke Kurtz, individually; Karen Reale, individually; and A. Kay Williams, individually, Defendants.

No. 00CV6433.

United States District Court, S.D. Florida, Miami Division.

Sept. 24, 2001.

Howard Talenfeld, Maria E. Abate, Colodny, Fass & Talenfeld, Fort Lauderdale, FL, Michael J. Dale, Nova Southeastern University Shepard Broad Law Center, Fort Lauderdale, FL, for David Bazerman.

Oscar E. Marrero, O'Conner Chimpoulis, Restani, Marrero & McAllister, P.A., Coral Gables, FL, for Karen Reale.

Elizabeth Rodriguez, April Lynn Bonner, Kubicki Draper, Miami, FL, for Cynthia McCarthy.

Michael W. Baker, Stephen W. Bazinsky, Bazinsky & Korman, P.A., Fort Laud-

erdale, FL, for Florida Deparrtment of Children and Family Services.

Ralph L. McGrath, Jr., Vernis & Bowling of Fort Lauderdale, P.A., Fort Lauderdale, FL, for Elke M. Kurtz.

Jeffrey Alan Rubinton, Greg McMahon, Luks, Koleos & Santaniello, P.A., Fort Lauderdale, FL, for A. Kay Williams.

### ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT BY MCCARTHY, REALE, ANDREWS, AND WILLIAMS; AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT BY KURTZ

MORENO, District Judge.

Plaintiffs, John Roes 1 through 5 and Jane Roe, who are natural siblings, brought this claim through their guardian *ad litem*, for deprivations their constitutional rights pursuant to 42 U.S.C. § 1983 and for negligence. The complaint was originally filed in the Seventeenth Judicial Circuit in and for Broward County, Florida and was subsequently removed to federal court. The remaining Defendants[1] are five individual state workers with the Department of Children and Family Services ("DCF") who had responsibilities for the well-being and safety of the children who were in the custody of the state foster care system. Defendants filed their motions for summary judgment asserting that they did not violate any clearly established constitutional right and there is no evidence that they acted with deliberate indifference and should be stripped of qualified immunity. For the reasons set forth below, qualified immunity does not apply to Defendants Cynthia McCarthy, Karen Reale, Margaret Andrews, and A. Kay Williams, therefore, thier motions for summary judgment are DENIED. Defendant Kurtz's motion for summary judgment is granted for the claim that she violated Plaintiffs' constitutional rights.

### Background

On December 7, 1990, John Roes 1 through 4 were removed from the custody of their natural mother and placed in the custody of the Department of Children and Family Services ("DCF"). On January 4, 1991, the children were adjudicated independent. Roes 1 and 4 were placed in the Holiday foster home, while Roes 2 and 3 were placed in the Marconi foster home. On June 11, 1991, Roes 1 and 4 were transferred from the Holiday foster home to the Fadden foster home. On July 11, 1991, Roes 2 and 3 were moved from the Marconi foster home to the Ferrara foster home. Jackie and Frank Lynch were licensed and became new foster parents on December 21, 1991. Roes 1 through 4 were placed with the Lynches at that time. The record before this Court includes myriad references to the conduct and motivations by certain Defendants in connection with the placement of the Roes in the Lynch home initially. As the complaint only seeks to impose liability on the Defendants in connection with the placement and lack of supervision while the Roes were with the Lynches, this evidence is relevant only to show that the Lynch home was not the only placement option as other foster parents had expressed interest at various times in adopting at least some of the Roe children.

### A. The Plaintiffs

At the time of the complaint, originally filed in September of 1999, Roe 1 was thirteen years old and had first come into the custody of DCF in 1989 when he was two years old. The twin boys, Roes 2 and 3, were eleven years old when the com-

---

1. The Department of Children and Family Sevices and Kathleen Kearney are, according to the parties, scheduled to begin trial on

negligence claims in state court beginning in February of 2002.

plaint was filed and first came into the custody of DCF in 1989 when they were seven months old. Roe 4 was nine years old at the time of the complaint.

John Roe 5 and Jane Roe, born on April 13, 1993, were placed with the Lynches on January 2, 1994. All six children were adopted by the Lynches in 1995. In August of 1997, the children were removed from the home of the Lynches because of the pervasive abuse they suffered while at their home.

## B. The Lynch Foster Home

The record of abuse includes allegations of incidents from as early as January of 1992, one month after the placement of Roes 1 through 4, and prior to the births and placement of Roe 5 and Jane Roe. The harrowing tale of abuse and neglect includes a well-developed record of physical abuse and verbal abuse both through the depositions of the children and the opinions of experts trained to recognize such abuse, including the expert retained by Defendants. Among the more disturbing elements in the record are that Jane Roe has reported that Michael S., the natural child of the Lynches, would rub his penis on her and then urinate on her. She has also drawn video cameras in her room supporting the opinion by Plaintiffs' experts that she was sexually abused. Roe 3 has expressed that he has memories of being videotaped in a sexual manner and that he and his siblings had been digitally penetrated while in the Lynch home. Roe 4 has exhibited inappropriate sexual behavior including sexually molesting the family dog—leading the Defendants' expert to believe that he too was sexually abused.

Jackie and Frank Lynch, according to Plaintiffs, should have been prevented from ever being foster parents. Mrs. Lynch's children were removed from her and her ex-husband in 1987 prior to the application by her and her husband to be foster care providers. The allegation was that Frank Strazzulla, Mrs. Lynch's former husband, had sexually abused Loren (or Lauren) S. years earlier with Jackie's knowledge. It was also alleged that Mrs. Lynch abused Loren S. and that the other children, Kristina, Jacqueline, and Michael S. were at risk of neglect and emotional abuse. Loren S. was taken into shelter care of February 3, 1987, and all of the children of Mrs. Lynch and Frank Strazzulla were adjudicated dependent on February 9, 1987. Further, there are allegations that DCF and its agents knew that Frank Lynch had abandoned his biological children and had been arrested for obstruction of justice and arrearages in child support payments.

In 1993, Michael S., Mrs. Lynch's biological son, was on community control due to a felony involving sexual misconduct with a minor. In this incident Michael S., fifteen at the time and living in the Lynch home, was arrested for indecent assault and sexual performance by a child for videotaping a fourteen year old girl and himself having sex. Another male, Chad Cosgrove, was involved in this incident who at the time was eighteen and living in the Lynch home in violation of foster care law. Copies of the videotape were made and distributed in the neighborhood. Additionally, there was evidence that Michael S. threatened the girl with physical violence prior to his arrest. Michael S. later pleaded no contest to sexual performance by a child.

In November of 1993, a staffing was called by Margaret Andrews in the Licensing Unit due to Michael S.'s criminal offense. The Defendants present at this meeting were McCarthy, Kurtz, Reale, and Andrews. Despite this event and discussions where it was revealed that there had been sexual abuse of Mrs. Lynch's natural daughter Loren S., the participants in the

staffing (except for Kurtz who provided only her recollection of the Lynch home and did not vote) unanimously decided that the children remained with the Lynches and Michael S. in violation of policy, pending the determination of whether there would be an exemption for this disqualifying event. Eventually an exemption was obtained from DCF.

The Lynch home was initially licensed in 1991, thereafter it was relicensed in December of 1992 and 1993. Before a relicensing could be approved for 1994, the children were placed in adoptive status.

### C. Cynthia McCarthy

McCarthy was assigned as a caseworker for the Plaintiffs on January 25, 1991 until June 5, 1991, prior to the Plaintiffs placement with the Lynches, and then from August 20, 1991 through May 20, 1992. Her position at the time was as a Senior Children and Family Services Counselor, which duties included working with the biological parents toward reunification, visiting with them in foster care placement, ensuring the children received appropriate medical attention, and various administrative functions.

On December 20, 1991, McCarthy delivered Roes 1 and 4 from the Fadden home to the Lynches. There is no documentation indicating that McCarthy ever returned thereafter to visit the foster home during the five months she was the sole caseworker. In addition to failing to perform home visits, McCarthy failed to document any assessment of the Roe children while in the Lynch foster home, and did not obtain a baseline assessment of their behavioral problems or physical and mental health. The record reveals that although Ann Marie Singh, a private therapist, visited the children, there was no real communication between McCarthy and Singh. McCarthy asserts that the department records are incomplete and that she

actually visited the children fifteen to twenty times while they were at the Lynches.

On January 22, 1992, McCarthy was notified by the Roe's Montessori school that Mrs. Lynch would send the children to school even when they were ill. McCarthy did not investigate the foster home as a result of this complaint. During McCarthy's conversation with Mrs. Lynch, Mrs. Lynch became upset and demanded that the children be removed from the Montessori school. McCarthy obliged Mrs. Lynch demand and removed the children.

On February 21, 1992, the guardian *ad litem* of Roes 1 through 4, Joan Milbery, reported both orally and in writing to McCarthy and in writing to Kurtz that the Roe children after living with the Lynches for two months exhibited drastic behavioral changes, appeared intimidated, and were not bonding with the Lynches. Milbery had to contact the Lynches a number of times before being able to perform her home visit. After the first visit on February 12, 1992, Milbery expressed that Roe 1 had changed dramatically and was described as a "whipped dog."

Milbery's second visit on February 20, 1992, was unannounced. Only Roe 1 was present at that time and his behavior had not changed for the better. The Lynches vehemently objected to the surprise nature of the visit and began yelling an Milbery. Milbery memorialized her observations in a letter to her supervisor, which was in turn supplied to McCarthy's supervisor Elke Kurtz. Mrs. Lynch authored a letter to McCarthy complaining of Milbery's surprise visit. As a result of the Lynch letter, McCarthy and Kurtz drafted a complaint to Milbery's supervisor. McCarthy, however, did not investigate Milbery's concerns.

McCarthy represented that the Lynch home was a positive place and that the

children should not be removed from it despite her knowledge of Milbery's complaints and Michael S.'s plea bargain to the sex crime at the staffing in November of 1993.

### D. Elke Kurtz

Kurtz became the Supervisor of a Children's Unit in March of 1990. Kurtz assigned McCarthy to the Roes in January of 1991. While Kurtz was on medical leave from April to July of 1991, McCarthy served as the acting supervisor.

After their placement in the Lynch home in December of 1991, Kurtz along with McCarthy was apprized of Milbery's observations about the Lynch home during her February of 1992 visits. Kurtz did not speak with Milbery regarding her observations before drafting the complaint to Milbery's supervisor in March of 1992. In April, Kurtz received a copy of Milbery's detailed observations about the Lynch home. She did not contact Milbery about her concerns, and did not review the case file. She failed to learn that McCarthy had not documented a single home visit.

In response to Milbery's letter, Kurtz, however, did call a staffing for May 5, 1992. At this staffing, Kurtz and McCarthy acquiesced to Mrs. Lynch's demands that Milbery be removed. It is alleged that Milbery was not able to present her observations of the Lynch home. On May 20, 1992, Kurtz received the case from McCarthy in order to transfer it to the permanent commitment unit.

In November of 1993, Kurtz attended the staffing initiated by Andrews to provide information. She was only present for a part of the meeting and did not vote on the outcome.

### E. Karen Reale

Reale was employed as a Children, Youth and Family Services Counselor in the Termination of Parental Rights Unit.

She was assigned to the Roes case from March of 1993 until April 27, 1994, when the file was transferred to the Adoptions Unit. Reale performed four home visits during the thirteen month period she was assigned to the case.

On May 11, 1993, her first visit, Reale received all of the medical and psychological information from Mrs. Lynch and did not document the presence of any children—at the time only Roes 1 through 4 resided in the home. On October 13, 1993, Reale also failed to document whether any of the children were present. During her two visits in 1994, Reale saw only Roe 5 and Jane Roe. These visits occurred on January 11, 1994, nine days after John Roe 5 and Jane Roe were placed in the Lynch home, and March 25, 1994.

In January of 1994, Mrs. Haydon, the prior foster parent of Roe 5 and Jane Roe, informed Reale that she had an "enemy" in Mrs. Lynch. Reale's only investigation into this event was to contact Mrs. Lynch who responded that Mrs. Haydon was a liar.

Reale proffers that her low number of visits was because of her high caseload. There is a dispute in the record about just how high this load was; the record shows, depending on who was asked, anywhere from around forty to over 100 cases (as asserted by Reale herself). At no point, however, did Reale memorialize that she was overburdened prior to this suit.

In a number of instances, Mrs. Lynch exhibited behavior to Reale that is best described as atypical for one operating a foster home. By all accounts, such occurrences should have given pause to the children's counselors and supervisors. In January of 1994, after Mrs. Lynch had requested daycare for the twins, she refused any aid that would require someone else to come into her home.

On March 3, 1994, in a conversation between Reale and Mrs. Lynch, after being informed that her foster care payments would likely be decreased, Mrs. Lynch responded with a threat that she would return the children to the department and that the adoption of the Roe children was being jeopardized. Specifically Reale reported, "She further stated she would bring in all six kids if she did not like the answer she gets. She will leave the children with us for placement. Jackie stated if you think Jeremy's $800 from SSI was going to shut me up you're crazy." App. I–B (3/3/94).

Mrs. Lynch again requested more money on March 21, 1994. Reale did not document Mrs. Lynch's threats though it is clear that such threats would have prompted further investigation had they been reported to a supervisor. Further, on March 28, 1994, Ms. Singh informed Reale that Mrs. Lynch was overwhelmed as a result of the placements of the twins, Roe 5 and Jane Roe. Less than one month later, on April 27, 1994, despite these signals, the Roe case was transferred to the Adoptions unit.

Reale was present at the November of 1993 staffing and voted to have the children remain in the Lynch home with Michael S. She also acquiesced in the decision to seek an exemption for this disqualifying event.

### F.  Margaret Andrews

Andrews was the relicensing counsel responsible for the Lynch foster home from 1992 through 1994. She discovered that there were problems in the initial licensing.

During the course of her duties in October of 1993, Andrews learned that in 1987, the natural children of Mrs. Lynch were the objects of an abuse investigation and dependency proceeding due to the claim by Loren S., Mrs. Lynch's natural child.

Andrews learned that Frank Strazzulla, Mrs. Lynch's former husband, had sexually abused Loren S. years earlier—an event that should have had significant ramifications on the fitness of Mrs. Lynch to be a foster parent. Other allegations that arose during this 1987 dependency proceeding were that Mrs. Lynch abused Loren S. emotionally and with excessive corporal punishment and that the other children, Kristina, Jacqueline, and Michael S. were at risk of neglect and emotional abuse.

Andrews investigations also revealed that Loren S. was taken into shelter care of February 3, 1987, and all of the children of Mrs. Lynch and Frank Strazzulla were adjudicated dependent on February 9, 1987. In the 1987 dependency file, Mrs. Lynch was described as defensive, emotionally lazy, domineering, loud and uncaring, seemingly deceptive, with a low frustration tolerance, and a person who does not like taking orders. As this information was not discovered during the initial licensing, Andrews was the first counselor to learn of this information. Andrews, however, failed to pull the DCF dependency file to examine the original abuse report, in terms of investigation, she only spoke with Mrs. Lynch about the incidents.

Andrews claimed that she spoke with her supervisor about the event, was told that she did not need to investigate it further and did not need to pull the file. There is a dispute in the record, however, about the reaction of her supervisor Mr. Doble to this information. Her supervisor wrote, "Pull hard copy"—Plaintiffs contend that this related to her disclosure of the sexual abuse. Despite the gravity of this newly discovered information dealing with sexual and corporal abuse, Andrews did no other investigation and did not in-

terview any of Mrs. Lynch's children involved in the investigation.

Andrews, however, convened the staffing in November of 1993 that ultimately decided not to remove the children from the Lynch home. At the staffing, Andrews revealed Michael S.'s no contest plea to sexual performance by a child along with the Strazzulla dependency events. Although these occurrences were discussed, the video of Roe 3, shown to Andrews by Mrs. Lynch, that depicted him "head-banging" was not disclosed to anyone else. Andrews also failed to disclose the presence of Chad Cosgrove in the Lynch home, Michael S.'s co-conspirator. Despite her knowledge of the events involving Mrs. Lynch in 1987 and Michael S., Andrews agreed that the Roes should not be removed from the Lynch home pending the hearing on the exemption for Michael S.'s disqualifying event.

### G.A. Kay Williams

Williams was the adoptions counselor that was assigned the Roe case in April of 1994. Her duties included investigating the suitability of the prospective adoptive home and performing home visits. In the course of her duties, Williams discovered that there were inconsistencies between the profile filled out by the Lynches—including prior marriages and Mr. Lynch's child support obligations—and official records. Williams was also aware of the Lynches' financial difficulty and Mrs. Lynch's threats and demands regarding subsidy payments. Williams did not document any assessment of the children and neglected to speak with the children's counselor.

In 1994, Ms. Singh noted that Roes 1 through 4 were displaying severe behavioral problems, Roe 4 stated he did not want to be adopted, Roe 3 wanted to die, and Roe 2 depicted Mr. Lynch as mean. After being notified on December 16, 1994, that

Roe 4 was the object of physical abuse, instead of contacting the abuse hotline as required by law, Williams instead contacted Mrs. Lynch about the abuse and also failed to inform her supervisors.

Williams failed to perform home visits between January 1995 and June 1995. According to Williams's own expert, her home study of the Lynches was incomplete and inaccurate. The approval by Williams's supervisors would have been affected had her supervisors known of the discrepancies involving the history of abuse, the Lynches' natural child Michael S., the lack of financial stability, that the Lynches had lied on their application, and the Lynch family background.

### Standard of Review

Summary judgment is authorized when there is no genuine issue of material fact. *Fed.R.Civ.P.* 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must present more than a scintilla of evidence in support of the nonmovant's position. A jury must be able reasonably to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### Analysis

#### A. Qualified Immunity

Qualified immunity protects government actors performing discretionary functions

from being sued in their individual capacities. *Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The privilege is an immunity from suit rather than simply a defense to liability. *Saucier,* 533 U.S. 194, 121 S.Ct. at 2156. The doctrine shields a government official's conduct from liability where the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Tindal v. Montgomery County Comm'n,* 32 F.3d 1535, 1539 (11th Cir.1994) (stating that the two prong test focuses courts on analyzing whether defendant's conduct violated a clearly established constitutional right and whether a reasonable government official would have been aware of that fact).

A court must undergo a two step process to determine whether qualified immunity protection will be available to the defendant. The first step is to evaluate whether a constitutional right has been violated. The *Saucier* Court has clearly set forth this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right?" *Saucier,* 533 U.S. 194, 121 S.Ct. at 2156. This requirement compels courts "to set forth principles which will become the basis for a holding that a right is clearly established." *Id.* With no constitutional violation there is no need to move onto the second step which is whether the right was clearly established. *Id.*

When considering whether a right is clearly established, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition...." *Id.* A constitutional right is clearly established if controlling precedent has recognized the right in a "concrete and factually defined context." *Lassiter,* 28 F.3d at 1149. Simply put, "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier,* 533 U.S. 194, 121 S.Ct. at 2156–57 (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (holding qualified immunity protects all but the plainly incompetent or those who knowingly violate the law)).

The Supreme Court has cautioned against granting a defense motion based on qualified immunity where the courts put forth a general rule but have not agreed on the precise formulation of the standard. *Saucier,* 533 U.S. 194, 121 S.Ct. at 2157 ("Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard.") It is clear, however, that the plaintiff has the burden of pointing to case law that pre-dates the alleged improper conduct of the official, involves materially similar facts, and compels the conclusion that plaintiff had a right under federal law. *Santamorena v. Georgia Military College,* 147 F.3d 1337 (11th Cir.1998).

## B. Violation of a Constitutional Right

The constitutional right implicated according to Plaintiffs is the fundamental right of physical safety violated by the

physical and emotional abuse at the hands of the Lynches. The Eleventh Circuit, in *Taylor v. Ledbetter*, 818 F.2d 791(11th Cir. 1987), a case involving a suit by a foster child against the state and county officials involved in her placement in a foster home, determined that one committed to the custody of the state involuntarily has a liberty interest in the safety of her environment that was grounded in the historic liberty interest protected substantively by the due process clause. *Id.* at 795 (citing *Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982)). The *Taylor* court stated, "The liberty interests in this case are the right to be free from the infliction of unnecessary pain, as that interest is protected by the fifth and fourteenth amendments, and the fundamental right to physical safety as protected by the fourteenth amendment." The Plaintiffs, therefore, have alleged facts that satisfy the threshold question as set forth in *Saucier* of whether the official's conduct violated a constitutional right.

## C. Clearly Established

### 1. *Taylor* and *Santamorena*: Involuntary vs. Voluntary

■ This matter was referred to a magistrate judge for a report and recommendation on the various summary judgment motions filed by Defendants. After determining that for a right to be clearly established, pre-existing case law must dictate the conclusion for every like situation, *Wilson v. Jones*, 251 F.3d 1340, 1344 (11th Cir.2001), the report and recommendation then interpreted the interaction of *Santamorena v. Georgia Military College*, 147 F.3d 1337 (11th Cir.1998) with the *en banc* opinion in *Taylor v. Ledbetter*, 818 F.2d 791(11th Cir.1987). Relying on a single statement in *Santamorena*, the magistrate judge determined that *Taylor* failed to provide the requisite "bright line" necessary to delineate the circumstances where an official would violate the Constitution.

As stated in Open Court at the hearing on September 20, 2001, after reviewing *Santamorena* and *Taylor*, this Court sustains Plaintiff's objection number two and declines to adopt the recommendation of the magistrate and hold that *Taylor* does not create a clearly established right under the facts of this case. The *Taylor* court determined that, "The state's action in assuming the responsibility of finding and keeping the child in a safe environment placed an obligation on the state to insure the continuing safety of that environment. The state's failure to meet that obligation, as evidenced by the child's injuries, in the absence of overriding societal interests, constituted a deprivation of liberty under the fourteenth amendment." *Taylor*, 818 F.2d at 795. The *Santamorena* court determined that the question presented for consideration in *Santamorena* was "whether, given the status of the preexisting law, the Defendants, at the pertinent time, clearly owed Plaintiff or H.S. some constitutional duty to protect H.S. based on the *voluntary*, custodial relationship between H.S. and GMC." *Santamorena*, 147 F.3d at 1340 (emphasis added). The panel held, "None of these cases, however, provide the 'bright line' necessary to delineate the concrete circumstances in which officials will violate the Constitution." *Id.* at 1341. The magistrate determined, based on this language, that *Taylor* could not be relied upon by officials to determine under which circumstances they would violate the Constitution.

The *Santamorena* court's holding was not that *Taylor* could never provide guidance to officials. The court held that under those circumstances, where officials were dealing with a voluntary rather than an involuntary custodial relationship, the officials would have been required to draw

highly debatable inferences. *Santamorena,* 147 F.3d at 1341. The *Santamorena* panel did not overrule *Taylor,* but wrote:

> These cases do not address the situation in this case: where an individual is voluntarily in the custody of the State or where the State represented that it would provide the individual with security. *Cf. Taylor,* 818 F.2d 791 (The court wrote these words about involuntary custody in foster homes: "The liberty interest in this case is analogous to the liberty interest in *Youngberg.* In both cases, the state *involuntarily* placed the person in a custodial environment, and in both cases, the person is unable to seek alternative living arrangements.") (emphasis added); *Cornelius,* 880 F.2d 348; *Spivey,* 29 F.3d 1522, *withdrawn, Spivey v. Elliott,* 41 F.3d 1497 (11th Cir.1995) (*Spivey II* ). Thus, these cases did not (and do not today) clearly establish that Defendants owed Plaintiff or H.S. a federal constitutional duty to protect H.S. from the incident in this case.

*Santamorena,* 147 F.3d at 1341–42 (footnotes omitted). *Taylor,* therefore, still controls in an involuntary custodial environment. Like *Taylor* and unlike *Santamorena,* this case involves children involuntarily placed in foster care, and the claims brought are against those in DCF for the failure to properly perform their responsibilities in monitoring these children in the foster home and for their failure to prevent the injuries suffered by Plaintiffs at the hands of their foster (later their adoptive) parents, the Lynches, and their natural child, Michael S.

### 2. Pre-existing Case Law: *Taylor*

As *Taylor v. Ledbetter,* 818 F.2d 791(11th Cir.1987), was clearly decided before the events that arose in this case, it serves as a sufficient basis to put these defendants on notice. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156–57, 150 L.Ed.2d 272 (2001). The plaintiffs in *Taylor* suffered "severe and permanent personal injuries as a result of being 'willfully struck, shaken, thrown down, beaten and otherwise severely abused by the foster mother.'" *Taylor,* 818 F.2d at 792. In *Taylor,* where the Eleventh Circuit determined the foster care officials were not entitled to qualified immunity protection, the allegations against the officials included that they, "(1) failed to thoroughly investigate the fitness of the foster home; (2) knew or should have known the foster parents were unfit to be trusted with her care, custody, and supervision; (3) failed to maintain proper supervision in inspection of the foster home; and (4) failed to obtain complete physical and medical records, or to furnish available records to the foster parents." *Id.* at 793.

Defendants claim that the facts in *Taylor* are not developed enough to guide foster care officials about what conduct will result in the deprivation of a constitutional right and liability under § 1983. The *Taylor* court, however, held, "Children in foster homes, unlike children in public schools, are isolated; no persons outside the home setting are present to witness and report mistreatment. The children are helpless. Without the *investigation, supervision,* and *constant contact required by statute,* a child placed in a foster home is at the mercy of the foster parents." *Id.* at 797 (emphasis added).

If this was not a directive clear enough to put those who work in the foster care system on notice that their duties are ignored at their peril, the *Taylor* court endorsed the decision of the Second Circuit in *Doe v. New York City Dept. of Social Services,* 649 F.2d 134 (2d Cir.1981) stating:

> The Second Circuit held that government officials may be liable under section 1983 not only for overt activity

which is unlawful and harmful, but also for failure to act when the duty to act exists. "When individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the Constitution. Thus, nonperformance of such custodial duties has been held to give rise to a section 1983 cause of action for prisoners." Doe, 649 F.2d at 141.

*Taylor*, 818 F.2d at 795–96. The *Taylor* court also included the following instructive quotation from the *Doe* opinion:

Defendants may be held liable under 1983 if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to a *known injury*, a *known risk*, or a *specific duty* and their failure to perform the duty or act to ameliorate the risk of injury was a proximate cause of plaintiff's deprivation of rights under the Constitution.

*Taylor*, 818 F.2d at 797 (emphasis added) (quoting *Doe*, 649 F.2d at 145).

In light of *Taylor*, notwithstanding *Santamorena*'s distinction between the voluntarily and involuntarily committed, a violation of a clearly established right occurs when there is a failure to perform certain affirmative duties including thoroughly investigating the fitness of the foster home, thoroughly investigating the fitness of the foster parents, maintaining proper supervision, and obtaining complete physical and mental records. As *Taylor* controls the case at bar, this Court needs to determine whether the acts or omissions at issue fits within the activities described by the *Taylor* court and whether such conduct rises to the level of deliberate indifference.

**D. Deliberate Indifference**

Where there is a clearly established right, it is the role of courts to determine whether the individuals acted with deliber-

ate indifference to those duties delineated through prior case law. The components of deliberate indifference as expressed by the Eleventh Circuit are (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Summary judgment must be granted for the defendants "unless the plaintiff presents evidence of the official's subjective knowledge." *Id.* (quotations omitted).

Defendants each contend that they did not violate any of their duties and if they did, *Taylor* gives an insufficient basis to put them on notice regarding their responsibilities. Indeed the burden of a plaintiff is a difficult one, "A child abused while in foster care, in order to successfully recover from state officials in a section 1983 action, will be faced with the difficult problem of showing actual knowledge of abuse or that agency personnel deliberately failed to learn what was occurring in the foster home." *Taylor*, 818 F.2d at 796. The question becomes what the defendants knew and what action or inaction resulted as well as what obligation they had under statute.

Section 409.145(1), Florida Statute (2001), the relevant portion of which is unchanged from the 1990 version, holds:

The department shall conduct, supervise, and administer a program for dependent children and their families. The services of the department are to be directed toward the following goals: ...

(c) The permanent placement of children who cannot be reunited with their families or when reunification would not be in the best interest of the child.

(d) The protection of dependent children or children alleged to be dependent, including provision of emergency and long-term alternative living arrangements.

### 1. Cynthia McCarthy

■ McCarthy failed to perform home visits, failed to document any assessment of the Roe children while in the Lynch foster home, and did not obtain a baseline assessment of their behavioral problems or physical and mental health. McCarthy failed to investigate the foster home as a result of the complaint by the Roes Montessori school in January of 1992 outside of contacting Mrs. Lynch, the subject of the complaint. She failed to make an independent investigation of the Lynch home after receiving the report of the guardian *ad litem* of the children's behavioral problems and the likening of Roe I to a "whipped dog."

McCarthy exhibited deliberate indifference to her specific duty to investigate the foster home, both in her failure to visit the home as her duties required and her failure to investigate disturbing reports from a teacher of the Roes and the guardian ad litem. *See Taylor*, 818 F.2d at 797 (stating that it is a Constitutional violation where one "exhibited deliberate indifference to a *known injury*, a *known risk*, or a *specific duty* and their failure to perform the duty or act to ameliorate the risk of injury....") (quoting *Doe*, 649 F.2d at 145). Furthermore, the decision of the staffing in November of 1993, where the participants were apprized of the significant risk to the Roe children including the Michael S. incident and the events in the Strazzulla home, was an exhibition of deliberate indifference to a known risk of harm despite the subsequent presentation and ratification of that portion of their decision dealing with Michael S. and his sex crime. *Id.* The participants in the staffing had subjective knowledge of a risk of serious harm but deliberately disregarded that risk. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir.1999). Qualified immunity does not shield McCarthy, therefore, her motion for summary judgment is DENIED.

### 2. Elke Kurtz

■ Although Kurtz also failed to investigate Milbery's concerns after her visits, she did convene a staffing to address Milbery's concerns. At that time the record was not so fully developed as to constitute a known risk. *Taylor*, 818 F.2d at 797. Of course, had McCarthy performed her duties, DCF may have been alerted to the severity of the situation at an early stage. Kurtz however, cannot be held liable for the deliberate omissions of McCarthy. It is also significant that Kurtz took no part in the decision-making at the staffing in November of 1993. Since Kurtz took some action in connection with the early allegations of abuse and did not participate in the decision in November of 1993, her motion for summary judgment is GRANTED.

### 3. Karen Reale

■ Reale performed an inadequate number of home visits while she was assigned to the Roes' case. Although she proffers that she had too high of a case load, there is a dispute about just how heavy this load was and whether she could not adequately perform her duties because of it. She failed to investigate into Mrs. Haydon's accusations about Mrs. Lynch. Reale was also privy to Mrs. Lynch's threats about returning the children and demanding more money. She neglected to inform her supervisors of these events. Reale exhibited deliberate indifference to these known risks; and failed to perform her specific duty to visit the home, investigate allegations, and inform her supervisors of Mrs. Lynch's threats. *Id.*

As a member of the decision-makers in November of 1993, Reale had subjective knowledge of a risk of serious harm but deliberately disregarded that risk. *McElligott*, 182 F.3d at 1255. By failing to perform these duties, she failed to amelio-

rate the risk of injury to the children. *Taylor,* 818 F.2d at 797. Reale is therefore not entitled to qualified immunity and her motion for summary judgment is DENIED.

#### 4. Margaret Andrews

 Andrews became aware of the Strazzulla family history, including the past allegations of sexual and physical abuse connected to Mrs. Lynch, and Mr. Lynch's arrest and debt, but failed to thoroughly investigate the information. Andrews also learned of Michael S.'s criminal plea and in response called the staffing of November 1993. Andrews presents a close call since Andrews took some actions once she learned of the dangerous situation.

However, she was a member of the decision-makers who did not separate the Roes from Michael S. pending the adjudication of whether this disqualifying event would be exempted. Also filed to present all information at the staffing she had concerning the Roes—specifically the head-banging and the presence of Chad Cosgrove in the Lynch home. She knew the risks but decided along with McCarthy and Reale that it was proper to recommend that the Roes stay in the Lynch home. She had the most information at the 1993 staffing but deliberately disregarded that risk. *McElligott,* 182 F.3d at 1255. Andrews failed to ameliorate the risk of injury to the children. *Taylor,* 818 F.2d at 797. Andrews motion for summary judgment is DENIED as she is not entitled to qualified immunity.

#### 5. A. Kay Williams

 Williams was aware of the Lynches' financial difficulties. She failed to perform home visits for a six month period. Most disturbingly, she was made aware of Singh's observations regarding the physical abuse of the children but did not contact the abuse hotline. There is evidence of the her subjective knowledge of the dangerous situation and the known risk. *Taylor,* 818 F.2d at 797; *McElligott,* 182 F.3d at 1255. She exhibited deliberate indifference to her specific duty to investigate the foster home. *Taylor,* 818 F.2d at 797. Williams is not entitled to qualified immunity and her motion for summary judgment is DENIED.

#### Conclusion

Defendants McCarthy, Reale, Andrews, and Williams failed to protect the Roes from the abuse they suffered at the hands of the Lynches to the degree of rising to the level of deliberate indifference. Therefore, they are not protected by the doctrine of qualified immunity. Wherefore, it is ADJUDGED that:

- McCarthy's motion for summary judgment is DENIED.
- Reale's motion for summary judgment is DENIED.
- Andrews's motion for summary judgment is DENIED.
- Williams's motion for summary judgment is DENIED.
- Kurtz's motion for summary judgment, however, is GRANTED on the § 1983 claim.